Date signed May 15, 2008



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MARYLAND
### at GREENBELT

|  |  |  |  |
|---|---|---|---|
| In Re: | * |  |  |
| Final Analysis, Inc. | * | Case No. | 01-21039-TJC |
|  | * | Chapter | 7 |
| Debtor | * |  |  |
|  | * |  |  |

## MEMORANDUM OPINION

In this Chapter 7 case of Final Analysis, Inc. (the "Debtor" or "FAI"), the Court has

before it the Objection to Notice of Transfer of Claim (the "Transfer Objection"). Docket No.

628. The Transfer Objection was filed by Margaret Becraft, Richard Kavanagh, Alexander

Kisin, Steve Merritt and James Anthony Sanders (collectively, the "Ahan Employees"). The

Ahan Employees object to the transfer of a claim from Ali Aref ("Aref") to Sharon Edwards

("Edwards") as reflected in the Notice of Transfer of Claim Pursuant to Federal Rule of

Bankruptcy Procedure 3001(e)(2), filed by Edwards.  Docket No. 615.[1]  Edwards filed the Edwards' Opposition to Ahan Employees Objection to Notice of Transfer of Claim, Docket No. 635.

The Ahan Employees contend that the transfer of the claim from Aref to Edwards is a sham transaction and is "a thinly veiled effort to enable Edwards, who is not an attorney, to engage in the unauthorized practice of law, and to otherwise engage in litigation for improper purposes."  Transfer Objection, p. 2.  For the reasons stated herein, the Court finds and concludes that Edwards practiced law without a license.  The Court further finds and concludes that Edwards acquired the claim to allow her to continue to represent others in litigation in this case under the guise of having a financial stake in the proceedings.  The Court will allow the transfer of the claim to Edwards.  The Court, however, will deny Edwards an attribute of the Aref Claim - the right to appear pro se in these proceedings.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).  The following constitutes the Court's findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

### A.    Background

This case has a long and contentious history dating back to September 4, 2001, when creditors of FAI filed an involuntary petition against it under Chapter 7 of the Bankruptcy Code.

---

[1] The proof of claim was originally filed by Ali Arefzadeh, who, the Court is informed, legally changed his name to Ali Aref before transferring the claim to Sharon Edwards on September 17, 2007.

The Court entered an order for relief on October 16, 2001, and Cheryl Rose ("the Trustee") was appointed the Chapter 7 Trustee shortly thereafter and has continued to serve in that capacity.

FAI was owned by Michael Ahan ("Ahan") and Nader Modanlo ("Modanlo"). Among FAI's assets was the majority of the outstanding stock of Final Analysis Communication Services, Inc. ("FACS").

In addition to FAI, both FACS and Modanlo are debtors in their own bankruptcy proceedings, Case Nos. 06-18520 and 05-26549, respectively. The Trustee, FACS, Modanlo and others have been involved in extensive litigation in numerous courts over the past seven years. Trials have been held in the Circuit Court for Montgomery County, the United States District Court for the District of Maryland and this Court.

In January, 2002, the Trustee sold all of the Debtor's stock in FACS, tangible personal property and equipment, software and technical documents and intellectual property. The Trustee currently holds approximately $3.2 million, which will be available to pay administrative claims and priority claims in full. She estimates that unsecured creditors will receive 90 cents on the dollar, but they may receive more depending on the resolution of the last remaining asset in the estate and the resolution of final claim objections.

Prior to the petition being filed, Ahan left FAI to start a new company, Ahan, Inc. Certain FAI employees, including the Ahan Employees, eventually went to work at his new company. A number of FAI employees, including Edwards and others identified herein as the "Modanlo Employees," remained at FAI.

### B. The Ahan Employees' Claims

On February 25, 2002, the Ahan Employees filed individual proofs of claim as follows:

- Margaret Becraft filed a proof of claim (Claim No. 71) for $1,152,534.44 for unissued FAI stock, overtime pay and wages;

- Richard Kavanagh filed a proof of claim (Claim No. 73) for $1,131,500 for unissued FAI stock and wages;

- Alexander Kisin filed a proof of claim (Claim No. 70) for $1,175,000 for unissued FAI stock, overtime pay and wages;

- Steven Merritt filed a proof of claim (Claim No. 72) for $1,203,269.44 for unissued FAI stock, overtime pay, wages and outstanding back wages;

- James Anthony Sanders filed a proof of claim (Claim No. 76) for $1,175,540 for unissued FAI stock, overtime pay and wages.

The claims filed by the Ahan Employees total $5,837,843.88.[2]

**C.      The Trustee's Proposed Compromise of the Ahan Employees' Claims**

The Trustee has worked diligently throughout this difficult case to bring it to a successful conclusion.  She is currently actively involved in the claims resolution process and has one remaining asset—a chose in action—to resolve.

As part of the claim resolution process, the Trustee reached a settlement with the Ahan Employees of their claims, subject to notice to creditors and hearing and Court approval.  On July 31, 2007, the Trustee filed an Omnibus Motion for Order Approving Compromises with Margaret Becraft, Richard E. Kavanagh, Alexander Kisin, Steven Merritt and James Anthony Sanders (the "Compromise Motion"), Docket No. 597.

---

[2] Mark Cascia, who also left FAI to join Ahan, Inc, filed a proof of claim, Claim No. 74. The resolution of his claim is the subject of a separate proposed compromise by the Trustee.

4

The Trustee's proposed compromise reduced the Ahan Employees' claims from $5,837,843.88 to $787,843.88, all as general prepetition unsecured claims, as follows:

- Margaret Becraft's claim is reduced from $1,152,534.44 to $152,534.44;

- Richard Kavanagh's claim is reduced from $1,131,500 to $81,500;

- Alexander Kisin's claim is reduced from $1,175,000 to $175,000;

- Steven Merritt's claim is reduced from $1,203,269.44 to $203,269.44;

- James Anthony Sanders' claim is reduced from $1,175,000 to $175,540.

As stated above, the Trustee estimates that, assuming the Compromise Motion is approved, unsecured creditors will receive 90 cents on the dollar, but may receive more depending on the resolution of the last remaining asset in the estate and the resolution of some final claim objections. She testified that if the Ahan Employees' claims were allowed in full, that would substantially dilute the distribution to unsecured creditors since their claims alone substantially exceed the amount she holds for distribution. She further testified that if the Ahan Employees' claims were disallowed in their entirety, the payout to unsecured creditors could reach 100%.

In the Compromise Motion, the Trustee provides her rationale for seeking approval of the compromise and contends that the proposed compromise with the Ahan Employees is in the best interest of the estate. The hearing on the Trustee's Compromise Motion has been continued as a result of the dispute over Edwards' claim and discovery disputes. In this memorandum, the Court makes no findings or conclusions with respect to the merits of the Compromise Motion or any objections thereto.

**D. The Modanlo Employees' Objection to the Trustee's Proposed Compromise to the Ahan Employees' Claims**

In response to the Compromise Motion, the Modanlo Employees made two Court filings. Edwards' involvement in these filings is among the actions that form the basis for the contention that she engaged in the unauthorized practice of law.

On August 17, 2007, Jan Friis, Larry Spedden, Yakov Segel, Ali Arefzadeh, Karl Olsoni, William Conway, Sandra Danzig, Tatiana Lawrence, and Ali Aladpoush filed Creditors' Objection to Claims of Margaret Becraft, Richard Kavanagh, Alexander Kisin, Steven Merritt, James Sanders, and Mark Cascia (the "Claim Objection"), Docket No. 601. The filing parties are former employees of the Debtor who were loyal to Modanlo and who did not leave for Ahan, Inc., and are referred to herein as the Modanlo Employees. The Modanlo Employees filed the Claim Objection pro se.

In the Claim Objection, the Modanlo Employees contend that the Ahan Employees' claims are "bogus," and "legally insupportable," and "ludicrous on [their] face." See Claim Objection, p. 8. They contend that the Ahan Employees' "purported 'claims' against the estate of FAI are based on several fanciful and legally unsupported theories." Id. at p. 7. The Modanlo Employees argued that the Ahan Employees, as professional employees of FAI, were never eligible for overtime pay. They also argued that because the Ahan Employees voluntarily resigned, they have no right to any stock. Furthermore, the Modanlo Employees stated that the Ahan Employees already received stock option benefits through their employment with Ahan, Inc. Obviously, these contentions will be addressed at the hearing on the Compromise Motion.

On August 20, 2007, the Modanlo Employees filed Creditors' Opposition to Omnibus Motion for Order Approving Compromises with Margaret Becraft, Richard E. Kavanagh,

Alexander Kisin, Steven Merritt and James Anthony Sanders ("Opposition to Compromise"),

Docket No. 602. The Opposition to Compromise was filed pro se. In it, the Modanlo

Employees argue that the Ahan Employees' claims are illegitimate and have no legal basis,

similar to their arguments made in their Claim Objection.

The Modanlo Employees also argue that the Trustee's proposed compromise harms the

"legitimate" creditors of FAI. Opposition to Compromise, p. 10. They note that their claims

represent "significant sacrifice, personal hardship, and loyalty to FAI." Id. The Modanlo

Employees contend that if the proposed compromise is approved there will not be enough funds

left in the bankruptcy estate to pay all claims, and thus it would "take money legitimately earned

away from the [Modanlo Employees] and their families and award it to persons filing fraudulent

proofs of claims." Id.

The Modanlo Employees cite several cases that hold that a compromise should be

approved only if the terms do not fall "below the lowest point in the range of reasonableness."

Id. at p. 11. The Modanlo Employees contend that the compromise falls below such a reasonable

point, noting that the Bankruptcy Court must weigh several factors: (1) the probability of

successful litigation; (2) any difficulties encountered in collection; (3) the litigation complexity,

as well as any expense, inconvenience and delay; and (4) the creditors' chief interest and

deference to their reasonable views. Id. at p. 11-12. The Modanlo Employees argue that these

factors are not met due to the "bogus" nature of the Ahan Employees' claims.

Finally, the Modanlo Employees argue that the Trustee's proposed compromise should

not be approved by this Court because the Trustee has not met her required burden. Citing

several cases, they argue that a Court should not "rubber stamp" the proposed compromise but should make itself aware of all the facts in order to make an informed decision.  Id. at p. 15.

      **E.**      **The Transfer of the Aref Claim to Edwards**

On September 17, 2007, Aref and Edwards executed an Assignment of Claim Agreement between Ali Aref and Sharon Edwards (the "Assignment").  Becraft Ex. 5.  It provides that Aref transfers to Edwards all right, title and interest in and to his claim in the FAI bankruptcy Case, Claim No. 28 (the "Aref Claim").  The Assignment contained a term that allowed Aref to repurchase the Aref Claim "at any time prior to payment by tendering to [Edwards] an amount equal to twice that of the purchase price."  Becraft Ex. 5 at p. 2, ¶7.

The Aref Claim is in the amount of $31,019.84 of which $4,650 is a priority claim (which will be paid in full) and $26,369.84 is a general unsecured prepetition claim. See Claim No. 28, Proof of Claim Register.

The purchase price was redacted in the version of the Assignment produced by Edwards in discovery.  The actual document produced by Edwards provides that the transfer is made "in consideration of the sum of XXX ('Purchase Price')."  Becraft Ex. 5 at p. 2, ¶7.  At the hearing on the Transfer Objection, when asked what she paid for the Aref Claim, Edwards asserted a relevance objection.  The Court overruled the objection.  See Transcript of Hearing on January 25, 2008 (hereinafter "January 25 Transcript"), p. 188.  Edwards testified unequivocally that "I paid $9,000." Id. at p. 189.  However, when pressed, she admitted she had not paid $9,000.  Rather, she testified she paid $3,000 on September 17, 2007, the day she signed the Assignment.

Id. at p. 192.  She testified she made a subsequent payment "sometime in late-ish October."  Id.[3]
Initially, she did not disclose the amount of the second payment, although she admitted she has
not paid the balance of the $9,000.  Id. at p. 190.  In closing argument, however, she stated that
"I paid $3,400." Transcript of Hearing on January 30, 2008, p. 35.  Accordingly, the record
establishes, and the Court finds, that Edwards paid $3,000 on September 17, 2007 and paid an
additional $400 in late October, 2007, after the Ahan Employees filed the Transfer Objection.

Edwards has not purchased any other claims in this or any other bankruptcy case.  She
testified that she bought the claim to "make money."  January 25 Transcript, at pp. 174-75.  She
also testified that, although she bought the Aref Claim after the Trustee filed the Compromise
Motion, she and Aref had been negotiating prior to the filing, and had a "meeting of the minds"
prior to September 17, 2007.  Id. at p. 176.  However, Edwards admitted that she was not a
creditor of the estate until September 17, 2007, when she executed the Assignment.  Id. at p. 160.

F.    The Transfer Objection

On October 4, 2007, the Ahan Employees filed the Transfer Objection.  They contend
that the transfer was made simply to allow Edwards to engage in the unauthorized practice of
law, and otherwise to engage in litigation for improper purposes.  See Transfer Objection, p. 2.
Specifically, they contend that Edwards admitted at a hearing before the Court on November 20,
2007, that she prepared, on behalf of the Modanlo Employees, the Claim Objection and the
Opposition to Compromise.  Transcript of Hearing on November 20, 2007, p. 28.  Both
documents were prepared and filed before Edwards acquired the claim. See supra at Section I.D.

---

[3] The Court notes that the Ahan Employees filed the Transfer Objection on October 4, 2007, well before "late-ish
October."

They also contend that she served discovery requests on each of the Ahan Employees before she acquired the Aref Claim, which again constituted the unauthorized practice of law.

Furthermore, the Ahan Employees argue that Edwards' purchase of the Aref Claim is illusory, conducted only for the purpose of gaining standing, and thus renders Edwards without any real economic interest in the case.

### G.    Edwards' Opposition to Objection to Transfer of Claim

On October 22, 2007, Edwards filed Edwards Opposition to Ahan Employees Objection to Notice of Transfer of Claim ("Edwards Opposition"), Docket No. 635.  Edwards argues that the Ahan Employees have no standing to object to the transfer, citing Federal Rule of Bankruptcy Procedure 3001(e)(2).  She contends that under the Rule, only the transferor can object to the proposed transfer of a claim.  Edwards further contends that she has an economic interest in the proceeding.  She argues her participation in the case is a result of financial self-interest and not a desire to practice law.  See Edwards Opposition, p. 6.  Edwards argues that her objection to the Trustee's proposed compromise is valid because according to her mathematical calculations, if the proposed compromise amount is paid, there will remain insufficient funds to pay other creditors of the FAI bankruptcy estate.

### H.  Edwards' Role

Edwards worked at FAI from 1995 to February 2000 and is currently employed by FACS. She is part of the group of Modanlo Employees.

Edwards has spent a substantial portion of her personal and professional time involved in legal proceedings concerning FAI, Modanlo and FACS, in both state and federal court.  Her primary responsibility at FACS is, and has been since 2002, "litigation support."  January 25

Transcript, at p. 148. She has been actively involved in FACS bankruptcy proceedings, the

Montgomery County litigation involving FAI and FACS, District Court litigation involving

General Dynamics, and litigation between FACS and Ballard Spahr. Id.

      Edwards edits pleadings, drafts interrogatories and conducts legal research. Id. at 149-

150. By her own admission, her knowledge of and ability to perform legal research, conduct

legal analysis, write legal briefs and engage in other legal matters is extensive. In the FACS

bankruptcy case, Edwards was accused of filing briefs that had been prepared by undisclosed

counsel. In defending herself against these allegations, she submitted the Declaration of Sharon

A. Edwards (Becraft Ex.1), which was intended to prove that she has the capability to prepare

and file briefs and otherwise conduct herself as an attorney without the assistance of counsel,

based on her education and experience. The declaration, filed under penalty of perjury, states:

> 1. In the preparation, research, and drafting of the motions I have signed and
> filed in [the FACS bankruptcy case] either individually or with my co-
> creditors, I have not received (directly or indirectly) any assistance of any kind
> [from any lawyers, with one exception not pertinent here.]
>
> ****************
>
> 3. To research legal issues and authority, I use both the internet and the
> Maryland State Law Library, located in the Courts of Appeal Building in
> Annapolis . . . .
>
> 4. I have a B.A. in Political Science and a M.A. in Policy Analysis. I have
> over twenty-five years professional experience in legal matters, in addition to
> some legal education (including education on legal research and drafting) in
> college and graduate school. As a legislative assistant for a Member of
> Congress and as a senior lobbyist with a private government relations firm, I
> have performed extensive legal and policy research and drafted legislation,
> amendments to legislation, report language, proposed regulations, regulatory
> public comments, committee hearing testimony, briefing memoranda, and
> presentations for executive branch agencies and senior government officials,
> among many other things. As the director of government relations at FAI and
> later as consultant to and then vice-president of FACS, I have drafted many

> regulatory agency pleadings, legal briefs, agreements and contracts.  I have
> been in charge of all FACS discovery in the various litigations in which the
> company has been involved.  In the General Dynamics litigation, for example,
> I have not only provided extensive comments and redrafting of briefs in that
> matter, I have also researched, located and provided case law to counsel.
> During trial, I chose all the trial deposition designations, and pre-trial, selected
> the final trial exhibits.  I have attended numerous trials and hearings,
> congressional hearings, and committee meetings.  Through this participation, I
> have gained a practicum education in civil procedure.

Becraft Ex. 1, p. 3-4.

Edwards' actions in this case bear out the statements in her declaration.  She writes extensive briefs, citing numerous authorities in citation form.[4]  She is comfortable making legal arguments, examining witnesses and handling exhibits.  Edwards appears able to research pertinent bankruptcy cases and the applicable rules and treatises regarding bankruptcy law.[5]  She functions as if she was a member of the bar—but she is not a member of the bar of this or any other court or jurisdiction.

Edwards has appeared at every hearing concerning the dispute between the Ahan Employees and Modanlo Employees since the Trustee filed the Compromise Motion.  She is the only member of the Modanlo Employees who has participated at the hearings.  Since the filing of the Transfer Objection and the Opposition to Compromise, Edwards has drafted or participated in the filing of the following documents:

- Docket No. 730: Creditor Sharon Edwards Reply in Support of Creditors (sic) Motion to Enforce Subpoena and to Compel Production of Documents.  Edwards signed the reply and Certificate of Service.

---

[4] Early on, due to the professional nature of the Modanlo Employees' filings, several attorneys and the Court questioned whether a lawyer was "ghost writing" the documents.

[5] See, e.g., Transcript of Hearing on November 20, 2007, p. 30, lines 9-10, statement of Edwards: "Well, I believe that's from Colliers on bankruptcy, and I can follow the line with the cite.  There is a line of case law, which I'd be happy to file . . . ."

- Docket No. 728: Creditors (sic) Opposition to Trustee's Motion for Protective Order. Edwards signed the opposition, Yakov Segel signed for himself and on behalf of Jan Friis, Karl Olsoni, Larry Spedden, William Conway, Ali Aladpoush and Tatiana Lawrence.  Yakov Segel also signed the Certificate of Service.

- Docket No. 724: Creditors (sic) Motion to Continue Hearing and to Amend Scheduling Order.  Edwards signed the motion on behalf of herself and on behalf of Jan Friis, Karl Olsoni, Larry Spedden, William Conway, Yakov Segel, Ali Aladpoush and Tatiana Lawrence, as well as signing the Certificate of Service.

- Docket No. 723: Creditors (sic) Motion to Continue Hearing and to Amend Scheduling Order.  Edwards signed the motion on behalf of herself and on behalf of Jan Friis, Karl Olsoni, Larry Spedden, William Conway, Yakov Segel, Ali Aladpoush and Tatiana Lawrence, as well as signing the Certificate of Service.

- Docket No. 722: Creditors (sic) Motion to Enforce Subpoena and to Compel Production of Documents.  Edwards signed the opposition, Yakov Segel signed for himself and on behalf of Jan Friis, Karl Olsoni, Larry Spedden, William Conway, Ali Aladpoush and Tatiana Lawrence.  Yakov Segel also signed the Certificate of Service.

- Docket No. 697: Edwards' Memorandum of Points and Authorities in Support of Edwards' Opposition to Objection to Transfer of Claim.  Edwards signed the memorandum and the Certificate of Service.

- Docket No. 669: Creditors (sic) Motion for Expedited Order Compelling Margaret Becraft, Richard Kavanagh, Alexander Kisin, Steven Merritt, James Sanders, and Mark Cascia to Respond to Creditors' Discovery Requests, and for Sanctions.  Edwards signed the motion on behalf of herself and on behalf of Jan Friis, Karl Olsoni, Larry Spedden, William Conway, Yakov Segel, Ali Aladpoush and Tatiana Lawrence, as well as signing the Certificate of Service.  Edwards also signed the Certificate Regarding Attempt to Resolve Discovery Dispute.  Edwards also attached several exhibits compromised of emails between herself and the Ahan Employee's counsel, between herself and the Trustee's counsel and between herself and Mark Cascia.

- Docket No. 661: Creditors' Opposition to Motion for Order Approving Compromise with Mark Cascia.  Edwards signed the opposition, Yakov Segel signed for himself and on

behalf of Jan Friis, Karl Olsoni, Larry Spedden, William Conway, Ali Aladpoush and Tatiana Lawrence.  Yakov Segel also signed the Certificate of Service.

- Docket No. 660: Creditors' Second Set of Interrogatories and Second Request for Production of Documents.  Edwards signed the request, Yakov Segel signed for himself and on behalf of Jan Friis, Karl Olsoni, Larry Spedden, William Conway, Ali Aladpoush and Tatiana Lawrence.  Yakov Segel also signed the Certificate of Service.

- Docket No. 635: Edwards (sic) Opposition to Ahan Employees (sic) Objection to Notice of Transfer of Claim.  Edwards signed the opposition and the Certificate of Service.

- Docket No. 616: Notice of Transfer of Claim Pursuant to FRBP 3001 E (2) (sic). Edwards signed the notice.  Edwards and Aref signed the attached transfer agreement.

- Docket No. 615: Notice of Transfer of Claim Pursuant to FRBP 3001 E (2) (sic). Edwards signed the notice.  Edwards and Aref signed the attached transfer agreement.

- Docket No. 614: Notice of Appearance and Request for Service of Notices and Papers. Edwards signed the notice.

- Docket No. 609: Creditors' Motion to Continue Hearing and to Consolidate Hearing on Trustee's Application to Compromise with Creditors' Objection.  Edwards signed on behalf of Karl Olsoni, Ali Aladpoush and Tatiana Lawrence.  Aref signed on behalf of himself and on behalf of Jan Friis, as well as signing the Certificate of Service.

The Ahan Employees contend that Edwards has engaged in the unauthorized practice of law.  The Court's specific findings and conclusion with respect to whether Edwards engaged in the unauthorized practice of law are contained in Section II. B, infra.

## II.    CONCLUSIONS OF LAW

### A.    Bankruptcy Rule 3001(e)

Rule 3001(e) of the Federal Rules of Bankruptcy Procedure sets forth the procedures for the transfer of previously filed claims.  Subsection 3001(e)(2) provides:

14

> If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee.  The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 20 days of the mailing of the notice or within any additional time allowed by the court.  If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor.  If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

Fed. R. Bank. P. 3001(e)(2).  Edwards argues that the plain language of Rule 3001(e)(2) precludes objections to the transfer by any party other than the transferor.

Bankruptcy Rule 3001(e) was amended in 1991.  The amended rule ". . . was expressly intended to curtail judicial oversight of the claim assignment process itself by eliminating notice to third parties and limiting the court's role to determining disputes between assignee and assignor, the only party entitled to notice of the purported transfer."  In re Lynn, 285 B.R. 858, 861 (Bankr. S.D.N.Y. 2002); see also, Advisory Committee Notes to 1991 Amendment Note to Subdivision (e) ("Subdivision (e) is amended to limit the court's role to the adjudication of disputes regarding transfers of claims . . . If a timely objection is filed, the court's role is to determine whether a transfer has been made that is enforceable under non-bankruptcy law.").

The express language in the Rule limiting any objection to the transferor and the language of the Advisory Committee Notes has spawned several decisions holding that only the transferor has standing to object to an assignment of a claim.  See, e.g., Viking Associates v. Drewes (In re Olson), 120 F.3d 98, 101 (8th Cir. 1997) ("The text of the rule makes clear that the existence of a 'dispute' depends upon an objection by the transferor.  Where there is no dispute, there is no longer any role for the court."); In re Lynn, 285 B.R. at 862 ("Given Bankruptcy Rule

3001(e)(2)'s plain language, as confirmed by the Advisory Committee Note, third parties, including the Debtor, do not have standing to object to a claim assignment itself.").

Many courts, however, employ their equitable powers under 11 U.S.C. § 105 and other bankruptcy provisions "to regulate *attributes* of an assigned claim if the assignee uses the claim improperly." In re Lynn, 285 B.R. at 862 (emphasis supplied).[6] See e.g., Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims, 160 F.3d 982 (3d Cir. 1998) (affirming the equitable subordination of claims purchased at a discount by a fiduciary of a debtor because the purchaser breached its fiduciary duty when purchasing the claims.); Young v. Beugen (In re Beugen), 99 B.R. 961, 965 (9th Cir. B.A.P. 1989), aff'd, 930 F.2d 26 (9th Cir. 1991) (denying an objection to a debtor's discharge brought by a claim purchaser who was nothing more than a vexatious litigant. "The right to object to a debtor's discharge is not a marketable commodity which may be purchased by one party from another in order to inflict further punishment and discomfort upon the debtor."); Prin Corp. v. Altman (In re Altman), 265 B.R. 652, 658 (Bankr. D. Conn. 2001) ("As a court of equity, a bankruptcy court should carefully scrutinize a timely plausible argument that a proof of claim was fraudulently assigned. To rule otherwise would suggest that unless one of the parties to such fraudulent conduct objects, a bankruptcy court would be powerless to fashion an appropriate remedy.").

---

[6] While the court in Lynn denied an objection to a transfer of a claim under the principle that generally only the transferor may object to the assignment of a claim under Bankruptcy Rule 3001(e)(2), it recognized a separate legal doctrine that allows a bankruptcy court to regulate the attributes of an assigned claim in cases where the claim is purchased for an improper purpose or the assignee engaged in improper conduct. It went on to find that, in that case, there was no improper purpose behind the purchase of, or improper action taken with respect to, the claim and therefore there was no reason to invoke "any remedy against the assigned claim's attributes." 285 B.R. at 863.

The Court will allow the transfer of the Aref Claim to Edwards. However, for the reasons that follow, the Court finds and concludes that Edwards has engaged in the unauthorized practice of law and acquired the Aref Claim for an improper purpose, namely to sanitize her unauthorized practice of law and to represent the Modanlo Employees in their effort to deny the Ahan Employees' claims and the Trustee's proposed compromise. Therefore, as a sanction, the Court will deny Edwards an attribute of the Aref Claim—the right to appear pro se in these proceedings.

### B.    Unauthorized Practice of Law

The Ahan Employees contend that Edwards has engaged in the unauthorized practice of law. This Court agrees.

Maryland law requires that an individual be a member of the Maryland State Bar before practicing, attempting to practice, or offering to practice law in the state. See MD CODE ANN., BUS. OCC. & PROF. § 10-601(a) (2008). This important policy provision protects the public from being injured by individuals not competent, responsible, or ethical to practice law. Turkey Point Property Owners' Ass'n v. Anderson, 666 A.2d 904, 908 (Md. Ct. Spec. App. 1995). This policy is embodied in the Local Rules of this Court, which require that, with certain exceptions not applicable here, only members of the Bar of the United States District Court for the District of Maryland may appear as counsel. See Md. Bankr. Loc. R. 9010-3. As stated in the Comment to Rule 5.5 of the Maryland Lawyer's Rules of Professional Conduct:

> The definition of the practice of law is established by law and varies from one jurisdiction to another. Whatever the definition, limiting the practice of law to members of the bar protects the public against rendition of legal services by unqualified persons.

Comm. on Maryland Lawyer's Rules of Prof'l Conduct, Formal Op. 28 (2008).

This Court has subject matter jurisdiction to determine whether a party in a bankruptcy proceeding had practiced law without authorization.  The practice of law before this Court is a matter that arises in or is related to a case under Title 11.  See 28 U.S.C. §1334(b).  In In re Douglas, 304 B.R. 223 (Bankr. D. Md. 2003), the Court found that a claim of unauthorized legal practice is "certainly a 'matter concerning the administration of the estate,'" and therefore is a core matter.  Id. at 232 (quoting 28 U.S.C. § 157(b)(2)(A)).  Similarly, the Court in In re Lucas, 312 B.R. 559, 573 (Bankr. D. Md. 2004), determined that it had "the inherent power to regulate [legal] practice in cases before it."  The Lucas Court found that as a unit of the United States District Court of Maryland, the Bankruptcy Court's power to regulate the practice before it was derived from the District Court's Local Rules which concern attorney regulation.[7]

The Lucas court set forth the definition of the practice of law in Maryland:

> under Maryland law, the focus of the inquiry on whether an individual has engaged in the practice of law should be on whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent.  The preparation of legal documents, their interpretation, the giving of legal advice, and the application of legal principles to problems of any complexity constitutes the practice of law.  The practice of law in Maryland also includes drawing for others written instruments which require more than the most elementary knowledge of the law, or more than that which the ordinary or average laymen may be deemed to possess, in situations where special legal knowledge and skill are required.

Id. at 575 (internal quotations and citations omitted).  Applying this definition, this Court finds and concludes that Edwards has engaged in the unauthorized practice of law.

First, before Edwards acquired the Aref Claim, she researched and drafted the Claim Objection on behalf of the Modanlo Employees, as described further, supra, at Section I. D.  The

---

[7] See Md. Loc. R. 701, 703 and 704.

Claim Objection, filed on August 17, 2007, is fourteen pages long and, like many bankruptcy briefs, it is divided into a background section (complete with numbered paragraphs) and an argument section.  The argument section is organized into several arguments, applying the facts the argument, and citing the Maryland Department of Labor and Licensing guidelines.  Edwards signed the name of Tatiana Lawrence, one of the Modanlo Employees on whose behalf the Claim Objection was filed.  The Court finds and concludes that, by researching and drafting the Claim Objection, Edwards engaged in the unauthorized practice of law.

Second, also before Edwards acquired the Aref Claim, she researched and drafted the Opposition to Compromise on behalf of the Modanlo Employees, as described further, supra Section I. D.  The Opposition to Compromise, filed with the Court on August 20, 2007,  is seventeen pages long and, like many bankruptcy briefs, it is divided into a background section (complete with numbered paragraphs) and an argument section. The argument section cites and discusses many cases and contains several statutory citations.  It sets forth a discussion of the standards for approving a bankruptcy trustee's proposed compromise.  It applies the Modanlo Employees' recitation of the facts to the legal principles.  Portions of the Ahan Employees' testimony are quoted in footnotes.  Edwards signed the document for Tatiana Lawrence and Larry Spedden.  The Court finds and concludes that, by researching and drafting the Opposition to Compromise, Edwards engaged in the unauthorized practice of law.

Third, also before Edwards acquired the Aref Claim, she actively participated in drafting and serving the Creditors (sic) First Set of Interrogatories and First Request for Production of Documents, one of which was served on each of the five Ahan Employees.  See also, Docket No. 669 at ¶4 and n.1.  The discovery requests provide that the document production is to be made at

Edwards' residence, complete with her address, phone number and email.  The discovery requests refer to several Federal Rules of Civil Procedure, contain a detailed "Instructions and Definitions" section and are comprehensive in nature.  Edwards subsequently prosecuted a motion to compel production on these requests.  See Docket No. 669.  The motion to compel includes as exhibits numerous emails between Edwards and counsel for the Ahan Employees and counsel for the Trustee.  Id. at Exhibits B-E.  None of these emails were sent by any Modanlo Employee other than Edwards.  The Court finds and concludes that, by participating in the drafting of these five sets of discovery requests on behalf of the Modanlo Employees, Edwards engaged in the unauthorized practice of law.

Edwards contends that she had a "meeting of the minds" with Aref to acquire the Aref Claim at the time she drafted the Claim Objection and the Opposition to Compromise.  Whether or not this is true, however, Edwards plainly admitted under oath that she was not a creditor of this estate until September 17, 2007, when she executed the Assignment. January 25 Transcript at 160.  To that point, at most Edwards held a potential breach claim against Aref if he had not gone forward with executing the Assignment.  She held no rights against or pecuniary interest in this estate.  See Yadkin Valley Bank and Trust Co. v. McGee (In re Hutchinson), 5 F.3d 750, 756 (4th Cir. 1993) (although the Bankruptcy Code does not define the term "party in interest," the term "is generally understood to include all persons whose pecuniary interests are directly affected by the bankruptcy proceedings.")[8]

---

[8] Moreover, even if Edwards had not engaged in the unauthorized practice of law before she acquired the Aref Claim, the Court nevertheless would deny her the right to participate pro se in these proceedings because of her improper purpose in acquiring the Aref Claim, namely, to enable her to represent the interests of the Modanlo Employees in their dispute over the validity of the Ahan Employees' claims.

Finally, the Court points to another example of Edwards' improper involvement in this case. The Court held a hearing on the Trustee's objection to the claim of Yakov Segel ("Segel"), who is one of the Modanlo Employees. During the hearing, Edwards sat at counsel's table with Segel, even though she had no stake in the outcome. The Court observed that she passed notes to him, prompting him to make arguments or statements. Her assistance was not helpful to the proceeding. See generally, January 25 Transcript at pp. 193-194. To the contrary, it was disruptive in that it was apparent to the Court that Segel appeared bewildered by the notes that Edwards had passed to him.[9] At one point, upon receiving a note from Edwards he attempted to make a hearsay objection to testimony, even though it was apparent he was unsure of what that meant. Id. at pp. 34-36; 46-48. When questioned by the Court, Edwards explained that she was just reminding Segel of a fact that he forgot, because he suffers from nervousness. Id. at pp. 193-94. However, the Court plainly observed that Segel attempted to make legal objections upon receiving the notes from Edwards, and thus has serious reservations that the notes were limited to "facts."

## C.  **Appropriate Sanction**

A Bankruptcy Court has equitable powers under Section 105 of the Bankruptcy Code, 11 U.S.C. § 105.[10] Section 105(a) bestows broad equitable powers to enter any order or otherwise

---

[9] Segel prevailed on his opposition to the Trustee's objection to his claim, and would have done so without the "assistance" of Edwards.

[10] While Section 105(a) is not an independent source of power and merely a power granted to enforce other provisions of the Bankruptcy Code, see In re GGC Assocs., 178 B.R. 862 (Bankr. M.D. Fla. 1995), courts have long held that Section 105(a) is a basis for a broad exercise of equitable powers, and that such equitable powers should be exercised only where it is necessary or appropriate to implement provisions of the Bankruptcy Code *or* where equity and substantial justice requires. In re Dunckle Assocs., Inc., 19 B.R. 481, 485 (Bankr. E.D. Pa. 1982) (emphasis added).

take action to curb abuses of the bankruptcy process and to preserve the integrity of the

Bankruptcy Court.  It provides:

> The court may issue any order, process, or judgment that is necessary or
> appropriate to carry out the provisions of this title.  No provision of this title
> providing for the raising of an issue by a party in interest shall be construed to
> preclude the court from, sua sponte, taking any action or making any
> determination necessary or appropriate to enforce or implement court orders or
> rules, or to prevent an abuse of process.

11 U.S.C. §105(a).  The basic purpose of Section 105(a) is to "enable a court to do whatever is

necessary to aid its jurisdiction, i.e., anything arising in or relating to a bankruptcy case."  In re

DeLorean Motor Co., 991 F.2d 1236, 1242 (6th Cir. 1993) (quoting 2 Collier on Bankruptcy

P105.02 at 103-05 (15th ed. 1987)).  In Marrama v. Citizens Bank, 127 S. Ct. 1105 (2007), the

Supreme Court reaffirmed the "broad authority granted to bankruptcy judges to take any action

that is necessary or appropriate 'to prevent the abuse of process' described in §105 . . ." 127 S.

Ct. at 1111-1112.  The Court there held that the broad authority granted to the Bankruptcy Court

in Section 105(a) was adequate to allow the Court to deny a debtor's motion to convert a Chapter

7 case to a Chapter 13 case, to prevent the debtor from abusing the bankruptcy system.  Id.

Courts have found that equity powers allow them to "sift the circumstances surrounding

any claim to see that injustice or unfairness is not done in administration of the bankrupt estate."

In re Executive Office Centers, Inc., 96 B.R. 642, 650 (Bankr. E. D. La 1988) (quoting Pepper v.

Litton, 308 U.S. 295, 307-08 (1939).  Section 105(a) also allows a Bankruptcy Court, for

example, to, sua sponte, raise and determine the issue of bad faith.  See Beard v. U.S. Trustee,

188 B.R. 220 (W.D. La. 1995).

Section 105(a) grants the Bankruptcy Courts the authority to choose the construction of a remedy.  In re Coleman Enterprises, Inc. held that

> [Section] 105(a) puts no facial restriction on the *structure* of relief that the courts can fashion under it, as long as they are furthering a principle identifiable in the applicable substantive law of bankruptcy.  Section 105(a) was enacted to promote such enforcement, through means that are tailored [to] the innumerable scenarios of financial distress in bankruptcy cases.

266 B.R. 423, 435 (Bankr. D. Minn. 2001) (holding that a court may deny standing or the right to participate to an individual it deems has abused the bankruptcy system).  As demonstrated in Douglas and Lucas, supra, a Bankruptcy Court's substantive law extends to governing the practice of law before it, and thus a Bankruptcy Court may use Section 105(a) to choose the form of remedy it finds necessary to curb the abusive unauthorized practice of law.  Similarly, in In re Arthur, an individual who was not authorized to practice law in any jurisdiction was advising and counseling people as to various Bankruptcy Code sections, advising the general public whether to file petitions under chapter 7, 11 or 13 of the Code, and writing and filing various documents with the Court. 15 B.R. 541, 543 (E.D. Pa. 1981). The Court found that Mr. Arthur was partaking in the unauthorized practice of law and, using its equitable powers, accordingly restrained and enjoined him from performing such services. Id. at 543.  In so doing, the Court noted that the responsibilities placed on an attorney are great and that "bestow[ing] such [] responsibility upon an individual who is not subject to the regulations of the legal profession would result in grave and injurious consequences for all parties involved." Id. at 545.

Edwards' actions in this case warrant a sanction that limits her participation in these proceedings.  Her actions make manifest the need for rules prohibiting lay persons from

23

practicing law.  Attorneys in Maryland are governed by the Maryland Lawyer's Rules of

Professional Conduct.  Those Rules impose on lawyers strict duties of candor to the Court.

Maryland Lawyer's Rules of Prof'l Conduct, Rule 3.3 (2008).

Edwards has exhibited little regard for these principles.  Having witnessed Edwards'

testimony and demeanor, the Court finds and concludes that Edwards lacks candor and

credibility.  She answers questions based on expediency rather than veracity.  Several examples

will serve to support the Court's findings and conclusions.

As set forth more fully in Findings of Fact, Section I. E, when asked what she paid for the

Aref Claim, Edwards stated flatly "I paid $9,000." See Id.  When pressed, she said she only paid

$3,000 upon execution of the Assignment, and made a second payment in late October.

Although in her testimony she was not forthcoming with the amount of the later payment, in her

closing argument she stated, apparently inadvertently, "I paid $3,400." Thus although she

testified unequivocally that she "paid $9,000," at most she has paid $3,400.  Further, she only

paid the additional $400 after the Ahan Employees filed the Transfer Objection contending that

the transfer was a sham and illusory.

In addition, the Assignment document she produced stated that the claim was being

transferred "in consideration of the sum of XXX ('Purchase Price') . . . ."  Becraft Ex. 5, p. 2.

But given her testimony on the amount she has or will pay for the claim, Edwards would have

the Court believe that, in place of "XXX" was something akin to "$9,000, of which $3,000 will

be paid at execution, and $400 will be paid in late October, and the balance will be paid at some

future unspecified date."

Moreover, Edwards stated she purchased the claim "to make money."  These statements sounded canned and rehearsed.  Edwards had researched the law of transfer of claims, citing numerous cases to the Court, and undoubtedly discovered that an investment motive would place her opposition to the Transfer Objection in the best light.  But Edwards readily admitted she has warm feelings for all of the Modanlo Employees, including Aref. She testified:

> The relationship between myself and the other [Modanlo Employees] has been a very long one.  We know each other very well.  We stay in touch even though many of them, most of them have now moved on to other occupations.  We discuss this bankruptcy and each other and so on.  It's a friendly group and one that has a lot of camaraderie because we've really gone through a lot together.

January 25 Transcript at p. 196.  Thus Edwards would have the Court believe that she decided to make a quick buck off of Aref, who is a member of this "friendly group . . .that has a lot of camaraderie," and that she did so by, thus far, paying less for the claim ($3,400) than is virtually guaranteed to be paid to the holder of the priority portion of the Aref Claim ($4,650).  Edwards did so even though she has never bought a claim in this or any other bankruptcy case.

Finally, the Court rejects Edwards' stated reason for her efforts to conduct what has amounted to scorched earth litigation over the Compromise Motion.  Edwards states that she has a financial stake in this proceeding and is entitled to challenge the Trustee's proposed compromise of the Ahan Employees' claims.  While that ordinarily may be true of a creditor in a bankruptcy case, her rationale rings hollow under the circumstances of her acquisition of the Aref Claim.

Edwards acquired a priority claim of $4,650 and a general unsecured claim of $26,369.84.  As set forth in the Findings of Fact, the Trustee testified that the priority claim will be paid in full and the general unsecured claim will be paid at least 90% and perhaps 100%.

Thus the holder of the Aref Claim will receive between $28,382.85 ($4,650 plus 90% of 26,369.84) and $31,019.84 ($4,650 plus 100% of $26,369.84).  Leaving aside whether Edwards pays only $3,400 for the Aref Claim or ultimately pays the alleged balance up to $9,000, she has approximately $2,600 to gain from her challenge to the Trustee's proposed compromise and her objection to the Ahan Employees' claims.  Even taking into account the possibility that interest may be paid on the claim, of which there was no testimony at the hearing, and her zealousness in pursuing the denial of the Ahan Employees' claims is alarmingly disproportionate to any potential economic recovery she may realize.

The Court finds the true motivation for Edwards' actions to be revealed in the rhetoric and vitriol contained in the Claim Objection and the Opposition to Compromise, both of which she researched and drafted before the transfer of the Aref Claim was being challenged.  There, she contended that the Ahan Employees filed fraudulent claims, lied under penalty of perjury, and violated federal law.  She stated that the Ahan Employees' claims are "bogus," and "ludicrous on [their] face."  <u>See</u> Claim Objection at p. 8.  She contended that the Ahan Employees' "purported 'claims' against the estate of FAI are based on several fanciful and legally unsupported theories."  <u>Id</u>. at p. 7.  She contended that the Trustee's proposed compromise harms the "legitimate" creditors of FAI, Opposition to Compromise at p. 10, and that the Modanlo Employees' claims represent "significant sacrifice, personal hardship, and loyalty to FAI."  <u>Id.</u>  She contended that if the proposed compromise is approved it would "take money legitimately earned away from the [Modanlo Employees] and their families and award it to persons filing fraudulent proofs of claims."  <u>Id.</u>  Edwards' trial testimony collaborated this finding.  She testified that she and the other Modanlo Employees were "appalled" and "everyone

26

was most upset" by the Trustee's proposed compromise of the Ahan Employees' claims.

January 25 Transcript at p. 178.

Indeed, Edwards' attitude toward the Ahan Employees is perhaps best explained by the description of events that led to the original rift between the Ahan Employees and the Modanlo Employees:

> Less than two weeks after the contract was signed, in early March 2000, while Mr. Modanlo was out of the country on a business trip to Russia, and without informing Mr. Modanlo, Ahan (who no longer was an employee or officer of FAI or FACS) called a meeting of certain FAI staff.  He offered to hire at Ahan Co. almost all of the FAI staff and offered them a lucrative compensation package.  The offer also included an ultimatum: if the employees did not agree to accept Ahan Co.'s offer, they would forego any possible future opportunity to be employed at Ahan Co. for work on the FAISAT System.  The employees were given only a few days to decide. The [Ahan Employees] all accepted Ahan's offer and voluntarily resigned from FAI in March 2000.  Those of the undersigned who were offered the package did not accept and remained employees of FAI.

Opposition to Compromise, p. 3-4.

In light of the foregoing and the record in this proceeding, the Court finds and concludes that (1) Edwards engaged in the unauthorized practice of law; (2) Edwards acquired the Aref Claim in order to represent and pursue the interests of the Modanlo Employees in challenging the Trustee's proposed compromise of the Ahan Employees' claims, and in prosecuting a challenge to those claims; and (3) this purpose was improper, as it was designed to allow Edwards to circumvent the rules governing the unauthorized practice of law.

As stated above, the Court will allow the transfer of the Aref Claim to Edwards. However, as a sanction for her actions, the Court will deny Edwards an attribute of the claim— the right to appear pro se in these proceedings.  Should she decide to continue to pursue her

"financial stake" in this case, Edwards may do so through counsel, who will, of course, be subject to the Maryland Lawyer's Rules of Professional Conduct.

### III.    CONCLUSION

For the foregoing reasons the Court will enter an order allowing the transfer of the Aref Claim to Edwards but denying Edwards the right to participate in the case pro se.  The Court <u>sua sponte</u> will continue all matters for two weeks to enable Edwards to retain counsel if she so chooses.

Copies to:

James M. Hoffman, Esquire
Shulman, Rogers, Gandal, Pordy & Ecker,
11921 Rockville Pike, Suite 300
Rockville, MD 20852


U.S. Trustee's Office
6303 Ivy Lane, Suite 600
Greenbelt, MD 20772


Cheryl E. Rose, Esquire
50 W. Edmonston Drive, #600
Rockville, MD 20852


Steven Merritt
307 Cedar Avenue
Edgewater, MD 21037


James Sanders
1583 Snug Harbor Rd.
Shady Side, MD 20764

Alexander Kisin
11606 Toulone Dr.
Potomac, MD 20854


Richard E. Kavanagh
601 Ford Road
Deale, MD 20751


Margaret Becraft
6113 Seminole St.
Berwyn Heights, MD 20740


Merrill Cohen, Esquire
7910 Woodmont Ave., #760
Bethesda, MD 20814


Joseph Suntum, Esquire
Miller, Miller & Canby
200-B Monroe St.
Rockville, MD 20850


Joel S. Aronson, Esquire
3 Bethesda, Metro Center, #650
Bethesda, MD 20850


Edward Tolchin, Esq.
10509 Judicial Dr., #300
Fairfax, VA 22030


Richard M. Goldberg, Esq.
36 S. Charles St., #2000
Baltimore, MD 21201



Mark Cascia
1200 Thompson Creek Road
Stevensville, MD 21666

Christopher Mead, Esquire
London & Mead
1225 19th St., NW, #320
Washington, DC 20036


Ali Aladpoush
2475 Virginia Ave., NW
Washington, DC 20037


Jan W. Friis, Jr.
9917 Derbyshire Lane
Bethesda, MD 20817


Karl E. Olsoni, Jr.
1622 Leslie Lane
Lake Oswego, OR 97034


Lawrence Spedden
2717 Boudwin Avenue
Boothwyn, PA 19061


William G.J. Conway
8701 Oxwell Lane
Laurel, MD 20708


Yakov Segel
15 Oak Hill Court
Owings Mills, MD 21117


Sharon Edwards
4922 43rd Ave.
Hyattsville, MD 20781



Sandra Danzig
1103 Kennedy St.
Falls Church, VA 22046

Tatiana Lawrence
8215 Wolftrap Road
Vienna, VA 22182

## END OF MEMORANDUM OPINION