Date signed September 24, 2009



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MARYLAND
## at GREENBELT

| | | | |
|---|---|---|---|
| In re: | * | | |
| Final Analysis, Inc., | * | Case No. | 01-21039-TJC |
| | * | Chapter | 7 |
| Debtor | * | | |
| | * | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### MEMORANDUM OF DECISION

In this Chapter 7 case of Debtor Final Analysis, Inc. (the "Debtor" or "FAI"), the
Court has before it two motions filed by Cheryl Rose, the Chapter 7 Trustee (the
"Trustee"): (1) the omnibus motion to compromise controversy with Margaret Becraft,
Richard Kavanagh IV, Alexander Kisin, Steven Merritt and James Anthony Sanders
(Docket No. 597); and (2) the motion to compromise controversy with Mark Cascia
(Docket No. 645). Former employees Ali Aladpoush, Ali Aredzadeh, William Conway,
Sandra Danzig, Jan Friis, Tatiana Lawrence and Yakov Segel (collectively, the
"Objecting Creditors") filed oppositions to both motions (Docket No. 602). The Trustee
filed a statement in support of the motions and the Court held an evidentiary hearing on
October 17 and 31, 2008. For the reasons stated herein, the Court will grant the motions

to the extent the Trustee seeks approval of the proposed settlement with Richard Kavanagh IV, and will deny the motions to the extent the Trustee seeks approval of the proposed settlements with the other claimants.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a), and Local Rule 402 of the United States District Court for the District of Maryland.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O). The following constitutes the Court's findings of fact and conclusions of law.

## I.       FINDINGS OF FACT

### A.      Background

This case has a long and contentious history dating back to September 4, 2001, when creditors of FAI filed an involuntary petition against it under Chapter 7 of the Bankruptcy Code.  The Court entered an order for relief on October 16, 2001, and Cheryl Rose was appointed the Chapter 7 Trustee shortly thereafter and has continued to serve in that capacity.

FAI was owned by Michael Ahan ("Ahan") and Nader Modanlo ("Modanlo"). Among FAI's assets was the majority of the outstanding stock of Final Analysis Communication Services, Inc. ("FACS").

In addition to FAI, both FACS and Modanlo are debtors in their own bankruptcy proceedings, Case Nos. 06-18520 and 05-26549, respectively.  The Trustee, FACS, Modanlo and others have been involved in extensive litigation in numerous courts over the past seven years.  Trials have been held in the Circuit Court for Montgomery County, the United States District Court for the District of Maryland, and this Court.

Prior to the petition being filed, Ahan left FAI to start a new company called Ahan, Inc.  All of the claimants who are the subject of the Trustee's proposed settlement, namely, Margaret Becraft ("Becraft"), Richard Kavanagh IV ("Kavanagh"), Alexander Kisin ("Kisin"), Steven Merritt ("Merritt"), James Anthony Sanders ("Sanders") and Mark Cascia ("Cascia") (collectively, the "Settling Claimants"), left the employment of the Debtor on March 30, 2000 and went to work at Ahan's new company.  Other FAI employees, including all of the Objecting Creditors, remained at FAI to work for Modanlo.  The Ahan/Modanlo split was, and apparently remains, rancorous, and has colored much of the administration of this bankruptcy case.  As the Trustee testified:

> It has been a very difficult case.  Everything in this case, regardless of which side of the two owners you want to say, things have been litigated. If it was something that favored Mr. Modanlo, Mr. Ahan would object.  If it was something that favored Mr. Ahan, Mr. Modanlo would object.  So it has been a litigious case all the way through.

Transcript of 10/17/08 hearing, p. 52.

In January 2002 the Trustee sold all of the Debtor's stock in FACS, tangible personal property and equipment, software and technical documents, and intellectual property.  As a result of this sale and the disposition of other assets, the Trustee currently holds approximately $3.2 million, which will be available to pay administrative claims and priority claims in full.  She estimates that unsecured creditors will receive ninety (90) cents on the dollar, but they may receive more depending on the disposition of the last remaining asset in the estate.  And, as discussed below, unsecured creditors may receive substantially less depending on the resolution of the Settling Claimants' claims.

### B.    The Settling Claimants' Claims

On February 25, 2002 the Settling Claimants filed individual proofs of claim, which they later amended, as follows:

<u>Margaret Becraft</u>.  Becraft filed a proof of claim (Claim No. 71) in the amount of $1,129,946 on February 25, 2002, consisting of $79,946 for unpaid overtime wages and $1,050,000 for unissued stock.   Her overtime wage claim is for unpaid overtime from April 1994, when she began working for FAI, until March 31, 2000, when she left to work for Ahan, Inc., at the rate of 1.5 times her pay at FAI.  Her overtime wage claim is a "conservative estimate" and the exact hours and rates can be obtained from the Debtor's records.  She states that "time and a half is due to being treated as an hourly employee during the entire period of employment."  Claim No. 71, p. 2.  Her stock claim is based on the following:

> In a meeting of 10 key personnel of the company, including myself, Nader Madanlo promised the ten employees a total of 2% of the company Final Analysis Communication Services Inc. Divided between 10 people that is 0.2% each.

> At the end of the employment period (3/31/00), FACS consisted of 15 million shares, so each of these 10 employees should have received 30,000 shares.  Also at that time each share was worth $35 so the promised figure per person should equal: 30,000 x 35 = 1,050,000.

*Id*.

She amended her claim by filing Claim No. 91, dated October 31, 2005 and filed on March 28, 2006, in the amount of $1,152,534.44.  In the amended claim, she sought $102,534.44 for unpaid overtime wages and continued to claim $1,050,000 for unissued stock. [1]

---

[1] Previously, on or about May 20, 2004, Becraft and a number of the other Settling Claimants submitted to the Trustee, but most did not file with the Court, an amended proof of claim that, among other things,

Richard Kavanagh.  Kavanagh filed a proof of claim (Claim No. 73) in the

amount of $1,131,500 on February 25, 2002, consisting of $81,529.50 for unpaid

overtime wages and $1,050,000 for unissued stock.  His overtime wage claim is for

unpaid overtime from July 1996, when he started employment with FAI, until March 31,

2000, when he left to work for Ahan, Inc., at the rate of 1.5 times his pay at FAI.  He

states that the exact hours and rates can be obtained from the Debtor's records, and that

"time and a half is due to being treated as an hourly employee during the entire period of

employment."  Claim No. 71, p. 2.  Kavanagh's stock claim is based on the following:

> In a meeting of 10 key personnel of the company, including
> myself, Nader Madanlo promised the ten employees a total of 2%
> of the company Final Analysis Communication Services Inc.
> Divided between 10 people that is 0.2% each.
>
> At the end of the employment period (3/31/00), FACS consisted of
> 15 million shares, so each of these 10 employees should have
> received 30,000 shares.  Also at that time each share was worth
> $35 so the promised figure per person should equal: 30,000 x 35 =
> 1,050,000.

 *Id*.

He amended his claim by filing Claim No. 93, dated October 31, 2005 and filed

on March 28, 2006, also in the amount of $1,131,500, and also consisting of $81,500 for

unpaid overtime wages and $1,050,000 for unissued stock.

---

eliminated the stock claim and reduced the overtime claim. Those amended claims were prepared and
submitted during settlement discussions with the Trustee, and were admitted into evidence at the hearing.
*See, e.g.*, Plaintiff's Exh. 1, p.4; Plaintiff's Exh. 2, p.4; Plaintiff's Exh. 3, p.4.  After consulting with
attorneys, most of the Settling Claimants filed amended proofs of claim asserting at least the amount they
sought in the original claims, on much the same theories. Contrary to the Objecting Creditors' views, the
existence of these lower proofs of claims that were prepared in connection with settlement efforts between
the Settling Claimants and the Trustee would not prejudice the Settling Claimants in the adjudication of
their claims.

Alexander Kisin.  Kisin filed a proof of claim (Claim No. 70) for $1,175,000 for unissued stock and overtime wages on February 25, 2002, consisting of $175,000 for unpaid overtime wages and $1,000,000 for unissued stock.   His overtime wage claim is for overtime from October 1, 1995 to March 31, 2000, when he left to work for Ahan, Inc.  He states that the exact hours and rates can be obtained from the Debtor's records. He states that "[a]ll FAI personnel was [*sic*] asked to work up to 58 hours per week based on an executive memo issued sometime in January-February of 1996."  Plaintiff's Exh. 3, p.6.

His stock claim

> is based on a public verbal promise made by Mr. Modanlo, FAI
> President, when he said during all hands meeting in 1-st quarter of
> 1999 that FAI allocated 2% of its 15,000,000 shares to key
> employee personnel.  At that time we had about 9-10 so-called key
> employees.  Mr. Modanlo also publicly mentioned that current
> stock price was $35 a piece.  Based on the above it was concluded
> that each key employee get about 0.2% shares of total FAI stocks
> which at that time was worth roughly $1,000,000.  Mr. Modanlo
> repeatedly refused to tell when he will distribute FAI stocks to
> employees under various excuses.

*Id*.

 He amended his claim by filing Claim No. 87 on June 11, 2004 in the amount of $6,992.64 for unpaid overtime wages from October 1999 through March 2000.  He again amended the proof of claim by filing Claim No. 95, dated October 31, 2005 and filed on March 28, 2006, in the original amount of $1,175,000, again consisting of $175,000 for unpaid overtime wages and $1,000,000 for unissued stock.

Steven Merritt.  Merritt filed a proof of claim (Claim No. 72) for $1,124,689.23 on February 25, 2002, consisting of $124,689.23 for unpaid overtime wages and $1,000,000 for unissued stock.  Merritt's overtime wage claim is for overtime wages

from January 1, 1995 to March 31, 2000, when he left to work for Ahan, Inc.  He states

that the exact hours and rates can be obtained from the Debtor's records.  He states that

he was promised by management that "compensation would be given for all

uncompensated hours."  Claim No. 72, p.2.

His stock claim of $1,000,000 is

> based on a public verbal promise made by Mr. N. Modanlo, FAI
> President, when he said during all hands meeting in 1st quarter of
> 1999 that FAI allocated 2% of its 15,000,000 shares to key
> employee personnel.  At that time we had about 9 – 10 so-called
> key employees. Mr. Modanlo also publicly mentioned that current
> stock price was $35.00 a share. Based on the above it was
> concluded that each key employee get about 0.2% shares of total
> FAI stock, at that time roughly $1,000,000 total value per
> employee.

*Id.*

He amended his claim by filing Claim No. 92, dated October 31, 2005 and filed

on March 28, 2006, in the amount of $1,203,269.44, consisting of $203,269.44 for

unpaid overtime wages and $1,000,000 for unissued stock.  The amended overtime wage

claim includes amounts for 1994.  *See* Plaintiff's Exh. 4, p.3.  He states that "the

calculation for the value of my claim for stock is the same as the original filing."  *Id.*

James Anthony Sanders.  Sanders filed a proof of claim (Claim No. 76) for

$175,540 on February 25, 2002 for "uncompensated overtime" worked during the period

July 17, 1993 through March 31, 2000.  He amended his claim by filing an unsigned,

undated claim (Claim No. 94) on March 28, 2006, in the amount of $236,310.  Sanders

has not filed a claim for unissued stock.

Mark Cascia.  Cascia filed a proof of claim (Claim No. 74) for $2,707,575 on

February 25, 2002, consisting of unissued FAI stock, overtime pay and unpaid bonus.

7

He sought claims for (1) overtime pay from August 25, 1995 through March 31, 2000 in the amount of $325,589.06; (2) unpaid "2% bonus on items brought into the company" totaling $1,332,000; and (3) stock in the amount of $1,050,000.

Cascia's bonus claim is based on, among other things, a letter dated April 4, 1994 from Modanlo as President of FAI. It states "[w]e would also offer you a bonus plan based on your activities and based on specific project. For example, the bonus planned for the SSTT project is 2% of the total contract price if awarded to FAI." Claim 74, p.2. Cascia calculated that he was entitled to 2% on various contracts listed on a schedule filed with his proof of claim, and described in a narrative filed therewith.

Cascia's stock claim is based on the following:

> Employee Stock Promise – In 1977, approximately 10 employees were called into conference room where the Chairman, President and CEO of FAI and FACS promised that each person in the room as key employees would be provided 2% of FACS. Dividing this equally among the people present, 1/10 of 2% of the 15 million shares of FACS is 30,000 shares, valued at the time of departure at $35 per share. This equates to $1,050,000. This was a verbal promise that can be corroborated by many people who were present.

Claim No. 74, p.5.

Cascia did not file an amended proof of claim. At the hearing, the Trustee introduced into evidence documents listed as "Cascia Proof of Claim 74-1" which contain many pages of documents that are not included in the Court's record as being filed with Mr. Cascia's original proof of claim. They appear to be a submission Cascia made to the Trustee in support of his claim and to offer a more expansive explanation of the claim. This submission will be addressed subsequently in this decision as applicable.

### C.    The Proposed Compromise with the Settling Claimants

According to the Trustee, her proposed compromise reduces the Settling Claimants' claims from $8,545,418.88 to $1,113,432.88, all as general prepetition unsecured claims, as follows:

- Becraft's claim is reduced from $1,152,534.44 to $152,534.44;

- Kavanagh's claim is reduced from $1,131,500 to $81,500;

- Kisin's claim is reduced from $1,175,000 to $175,000;

- Merritt's claim is reduced from $1,203,269.44 to $203,269.44;

- Sanders's claim is reduced from $1,175,000 to $175,540;[2]

- Cascia's claim is reduced from $2,707,575 to $325,589.

Other than Cascia's claim, the overall proposed settlement is more or less in the amount of the overtime claims of the Settling Claimants. The Trustee testified that one of her biggest concerns was the magnitude of the stock claims, which, if allowed, would substantially reduce the *pro rata* distribution to all other unsecured creditors. She further testified, however, that the settlement took into account her assessment of the likelihood of success of all the claims, and was not simply an agreement to pay the overtime claims in exchange for the disallowance of the stock claims.

As stated above, the Trustee estimates that, assuming the motions are approved, unsecured creditors will receive 90 cents on the dollar, but may receive more depending on the disposition of the last remaining asset in the estate and the resolution of some

---

[2] Although the Trustee states that Sanders' claim is in the amount of $1,175,000, according to the Clerk's claim register the only claims file by Sanders are Claims Nos. 76 and 94. Neither includes a stock claim and the latter, the larger of the two claims, is in the amount of $236,310.

9

final claim objections.  She testified that if the Settling Claimants' claims were allowed

in full, that would substantially dilute the distribution to unsecured creditors since their

claims alone substantially exceed the amount she currently holds for distribution.  She

further testified that if the Settling Claimants' claims were disallowed in their entirety,

the payout to unsecured creditors could reach 100%.  The Court finds the Trustee's

testimony to be credible on all matters.

**D.**    **The Trustee's Compromise Process**

The Trustee was appointed as Chapter 7 Trustee in this case in October 2001 and

began her duties by identifying the assets of the Debtor.  Initially, the Trustee requested

documents concerning the claims from Ahan and Modanlo, which did not result in many

documents being produced.  The bulk of the Trustee's information came from 40,000

pages of documents sent by Gardner, Carton and Douglas, FAI's prior counsel, obtained

with a good deal of difficulty because the Trustee had previously sued the firm for

malpractice on behalf of the estate.

The Trustee reviewed the time records and employee manuals supplied to her

and made numerous requests to all parties for any records corroborating or contradicting

the claims.  The Trustee requested records from the primary people she thought could

have information, including Modanlo, Ahan, Gardner, Carton and Douglas, Modanlo's

attorney, and the various trustees of the FACS bankruptcy estate and Modanlo's

bankruptcy estate.  The Trustee noted that she had not received all the documents she

asked for from Gardner, Carton and Douglas.

The Trustee spoke directly with Ahan on numerous occasions, and also with

Modanlo, their respective attorneys, and Jan Friis, a former vice president of FAI, in

order to discover whether the Settling Claimants' claims were supportable. Further, the Trustee wrote letters to the Settling Claimants seeking documents supporting their claims and reviewed the amendments the Settling Claimants made to their claims, including the supplemental information.

The Trustee, through counsel, deposed Ahan, and his deposition transcript was admitted into evidence.[3]

With respect to the overtime claims, the Trustee sought advice from employment attorneys regarding the issue of whether the Settling Claimants were exempt or non-exempt employees of FAI, and thus either ineligible or eligible for overtime pay. The Trustee received communications from James Rubin, the employment attorney the Settling Claimants hired to defend their overtime claims. The Trustee reviewed the employee manual which permitted an employee's exempt or non-exempt status to be waived or contractually altered by management. The Trustee learned from the Settling Claimants and their employment attorney that, under Maryland wage laws, the non-payment of the Settling Claimants' overtime made the claims subject to treble damages, as the Settling Claimants had worked more than forty hours a week. The Trustee and her counsel also reviewed the statute of limitations to determine whether the Settling Claimants were attempting to receive overtime for hours worked beyond the statute of limitations period, and took that into account in reaching the final terms of the proposed settlements.

---

[3] The Trustee did not directly contact any of the Objecting Creditors or any other employees of FAI, stating that it is not customary for a trustee to take such actions. The Objecting Creditors did not contact the Trustee or provide her with any contradictory documentation or other information, other than when they filed their exhibits prior to the hearing on the proposed settlement.

The Trustee also reviewed communications between attorneys at Gardner, Carton and Douglas concerning whether the statute of frauds could be a potential defense to the Settling Claimants' claim for stock.  The attorneys at Gardner, Carton and Douglas did not come to a definitive decision as to whether the statute of frauds applied to the oral promise of stock.  The Gardner, Carton and Douglas attorneys also did not come to a conclusive answer as to whether the statute of limitations applied to the FAI stock issuance.  The Trustee took all this into account in finalizing the proposed settlements.

The Trustee met with the Settling Claimants to discuss and assess their claims.  Present at this meeting was the Trustee, her attorney James Hoffman, her employment attorney, Greg Grant, the Settling Claimants, and the Settling Claimants' general and employment attorneys, Merrill Cohen and James Rubin, respectively.  A follow-up meeting also occurred in which the Trustee discussed certain points in order to verify the Settling Claimants' claims.  In speaking with the Settling Claimants and reviewing their documentation, the Trustee found their claims consistent, their documentation supportive, and the claimants themselves to be credible.  She also concluded that Ahan's testimony would generally support the Settling Claimants' claims. With respect to Modanlo, the Trustee has misgiving about his credibility in light of past events in this case and related litigation.[4]

---

[4] The Trustee previously brought a fraud action against Modanlo and believes his credibility would be subject to attack at a hearing on the objection to the Settling Claimants' claims

### E.  The Objecting Creditors' Objection to the Trustee's Compromise

In response to the Compromise Motion, the Objecting Creditors made two Court filings.  On August 20, 2007, the Objecting Creditors filed Creditors' Opposition to Omnibus Motion for Order Approving Compromises with Margaret Becraft, Richard E. Kavanagh, Alexander Kisin, Steven Merritt and James Anthony Sanders (Docket No. 602).  In it, the Objecting Creditors argue that the Settling Claimants, as professional employees of FAI, were exempt employees and never eligible for overtime pay.  They point to statements by Ahan in his deposition and by Modanlo at the October 31, 2008 hearing that no promises of overtime were ever made.  The Objecting Creditors also argue that because the Settling Claimants voluntarily resigned, they have no right to any stock, and that the Settling Claimants already received stock option benefits through their employment with Ahan, Inc.  Moreover, they argue that to the extent the promised stock was to be FACS stock, it was restricted and its marketability was limited.

### F.     The Hearing

The Trustee testified at the hearing in support of the settlement. The Objecting Creditors called Modanlo, William Conway ("Conway") and Yakov Segel ("Segel"). Conway was the controller of the Debtor between July 1998 and July 2001.  Segel was a consultant for the Debtor during much of the pertinent period.

Further findings will be made in the context of the factors that apply to the Court's consideration of the motions.

## II.     CONCLUSIONS OF LAW

Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or

13

settlement." Fed. R. Bankr. P. 9019(a).  A court may approve a settlement if it is "fair and equitable."  *Protective Comm. for Independent Stock Holders of TMT Trailer Ferry, Inc. v. Anderson ("Anderson")*, 390 U.S. 414, 424, *rhg. denied* 391 U.S. 909 (1968).  In making this determination, a court "should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  *Id.*

In order to approve a settlement according to this standard, a court must consider the following factors:

(1) the probability of success in litigation;

(2) the likely difficulties in collection;

(3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4) the paramount interest of the creditors.

*Will v. Northwestern Univ. (In re Nutraquest, Inc.),* 434 F.3d 639, 644 (3d Cir. 2006) (citation omitted); *see also In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995).  "Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation." *Anderson*, 390 U.S. at 424-425.  While the approval of a settlement is within the discretion of the bankruptcy court, it must actually exercise discretion and not simply "rubber stamp" the Trustee's proposal.  *Depoister v. Mary M. Holloway Found.,* 36 F.3d 582, 587 (7th Cir. 1994) (citation omitted).  "A court may approve a settlement over objections unless the proposed settlement falls below the lowest point of reasonableness."  *United States ex rel.*

*Rahman v. Oncology Assocs., P.C.,* 269 B.R. 139, 149-150 (D. Md. 2001) (internal

citation omitted), *aff'd, United States ex rel. Rahman v. Colkitt*, 61 Fed. Appx. 860 (4th

Cir. 2003).  "A settlement should be approved if it provides for 'the best possible

realization upon the available assets . . . without undue waste or needless or fruitless

litigation.'"  *Oncology Assocs.*, 269 B.R. at 150  (internal citation omitted).  "The

Trustee, as proponent of the proposed settlement, has the burden of establishing that the

settlement is fair and equitable and should be approved by the Court."  *In re Kay*, 223

B.R. 816, 819 (Bankr. M.D. Fla. 1998) (citing *In re A & C Properties,* 784 F.2d 1377,

1381 (9th Cir.), *cert. denied*. 479 U.S. 854 (1986)).

        In addressing the instant motions, the Court does not make final findings of fact

or conclusions of law on the merits of the Settling Claimants' claims, although it does

make findings in the context of the likelihood of success of the Settling Claimants'

underlying claims, as well as the other factors set forth above, with reasonableness as the

ultimate touchstone.  *See Depoister, supra*, 36 F.3d at 587 (Court must make a

substantive determination to some degree in order to "actually exercise discretion and

not simply rubber stamp the Trustee's proposal.")  *See also Matter of Carla Leather,

Inc.*, 44 B.R. 457, 470 (Bankr. S.D.N.Y. 1984), *aff'd* 50 B.R. 764 (S.D.N.Y. 1985)

(assessment of a settlement does not require resolution of the issues on the merits; the

issues need only be sufficiently considered "so that the bounds of reasonableness can be

seen with some clarity").

        Finally, the cases that address the standards applicable to a trustee's proposed

compromise usually involve the resolution of a claim constituting an asset of the estate,

*i.e.*, a litigation claim against a third party.  In that context the courts have ruled that the

compromise should be approved only if the terms do not fall "below the lowest point in the range of reasonableness." *Oncology Assocs., supra*, 269 B.R. at 149. Here, the Trustee is seeking approval of a compromise of claims against the estate. The proper formulation of the standard in this context is that the compromise must not be above the highest point in the range of reasonableness. That is to say, the Court will not approve the compromise if the Trustee seeks to settle the Settling Claimants' claims in an amount greater than they likely would achieve in a claim objection process. Stated otherwise, the Trustee's compromise must fall within the range of reasonable outcomes of the Settling Claimants' claims.

The Court now turns to a discussion of the four factors described above.

**A. Probability of Success Challenging the Claims**

If the Court does not approve the settlement, the Trustee and/or the Objecting Creditors could prosecute their objections to the Settling Claimants' claims. Section 502(a) provides that a "claim…proof of which is filed under §501…, is deemed allowed, unless a party in interest… objects." 11 U.S.C. §502(a). Section 502(b) provides that if an objection is made, the Court shall allow the claim except to the extent it is disallowable under one of the nine enumerated grounds for disallowing the claim contained therein. *See* §502(b)(1)-(9). Further, under Bankruptcy Rule 3001, a "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). A properly executed and filed proof of claim "is sufficient to shift the burden of producing evidence and to entitle the claimant to share in the distribution of the bankrupt's estate

unless an objector comes forward with evidence contradicting the claim." *In re Gates*, 214 B.R. 467 (Bankr. D. Md. 1997).

Here, the Settling Claimants timely filed their proofs of claims. No party contends that the Settling Claimants proofs of claims were not "executed and filed" in accordance with the Bankruptcy Rules. Accordingly, in the claim adjudication process, the claims of the Settling Claimants constitute prima facie evidence of the validity and amount of the claims, and the burden to establish a basis for disallowance under §502(b) is shifted to the Trustee and/or the Objecting Creditors. Accordingly, to successfully challenge these claims, the objecting party would have to establish that the claim "is unenforceable against the debtor…under any agreement or applicable law." 11 U.S.C. §502(b)(1).

In this regard, the Objecting Creditors do not point to any "applicable law" that would defeat the Settling Claimants' claims, other than the statute of limitations defense for overtime pay. Stated otherwise, the Objecting Creditors primarily contend that the claims are unenforceable as a matter of fact, not law. The Court now turns to an analysis of the parties' likelihood of success on the objections to the Settling Claimants' claims.

**1. Overtime Claims**

The record before the Court establishes that the Settling Claimants worked very long and hard hours to try to make the Debtor successful – very often working many more than forty hours a week – and were very committed to achieving success for the Debtor. The record also establishes that (1) it appears that the Settling Claimants were exempt employees, as were most of the Debtor's employees; (2) no party seriously disputes that exempt employees are entitled to overtime if authorized or promised by

17

their employer; and (3) no party objecting to the Settling Claimants' claims could summarily defeat the contention that the Settling Claimants were promised compensation in one form or another for all of their overtime work. Accordingly, the Court concludes that the Settling Claimants' claims for overtime are creditable, and therefore must determine the range of reasonable outcomes from resolution of the objections to the Settling Claimants' claims.

Modanlo testified that, around 1996, both he and Ahan wanted to be sure they classified employees correctly, and they consulted with attorneys and accountants. He testified that he believed the Debtor had very few, if any, nonexempt employees and they were paid overtime as appropriate. He further testified that the vast majority of the Debtor's employees were exempt employees and therefore ineligible for overtime. He testified that the books and records of the Debtor did not reflect any amounts were owed for overtime or any other unpaid wages. When the Debtor filed its bankruptcy schedules, no employee had claimed that the Debtor owed overtime wages. He testified that he never promised to pay the Settling Claimants overtime.

Conway was the controller of the Debtor between July 1998 and July 2001. He was responsible for the financial records of the Debtor. His testimony largely corroborates that of Modanlo.[5]

---

[5] Conway testified to several points: First, the only nonexempt employee of the Debtor was the receptionist. This point is not fatal to the Settling Claimants' claims for the reasons stated later in this memorandum that exempt employees are entitled to overtime if promised by their employer. Second, the Debtor did not carry on its books and records a liability for overtime to the Settling Claimants. But it is hardly surprising that a company did not carry a liability for claims arising from a breach of promise on its books and records. If that were the standard, few unliquidated claims would ever be allowed in a bankruptcy case. Third, he never heard Ahan or Modanlo promise overtime pay to the Settling Claimants. But he did not work for the Debtor prior to July 1998. In any event, if admissible at a subsequent hearing on an objection to the Settling Claimants' claims, this latter point perhaps means that Conway never heard

The Settling Claimants do not dispute that they were technically characterized as exempt employees, but contend that the Debtor's practice of docking their pay destroyed any claim that they are truly exempt. This point – primarily a legal one – has not been developed at any length, but would need to be addressed if the Court were to deny the motions.

Assuming that the Objecting Creditors could establish that the Settling Claimants were exempt employees does not end the inquiry, however. No party seriously disputes that exempt employees are entitled to overtime pay if promised or authorized by their employer. In this regard, the record establishes that the Debtor's practices were not altogether clear. The most direct statement on the matter was contained in the Debtor's Employee Handbook prior to 1999, which expressly stated:

> Non-exempt employees are entitled to overtime wages when they work more than forty (40) hours during one week. The overtime wage rate will be one times the regular hourly rate for the number of hours worked in excess of eight (8) hours in a day and in excess of forty (40) hours during one week. As authorized and/or approved by a corporate officer, exempt employees may also be entitled to overtime wages when they work more than forty (40) hours during one week.

Plaintiff's Exh. 13, pp. 3-6 (emphasis added). A memo from Modanlo to employees in 1998 stated that "Exempt employees are not entitled to overtime." Plaintiff's Exh. 21, p. 1 (emphasis in original). But this statement can be viewed simply as a corollary to the principle that exempt employees are entitled to overtime only if authorized by their employer. It is doubtful that if a business had a written policy that no exempt employees were entitled to overtime, but nevertheless specifically promised to compensate certain

---

such a promise and at most creates a credibility dispute between Conway and Modanlo, on the one hand, against the Settling Claimants and Ahan, on the other.

exempt employees for overtime hours, the business could escape liability by pointing to the policy.

Thus, the issue comes down largely to whether the Settling Claimants were promised that they would be compensated for overtime work. The Settling Claimants contend that they were promised they would be compensated for their overtime hours. Merritt's claim and Cascia's written justification submitted to the Trustee are the most direct. Merritt's claim states "I was promised by management that compensation would be given for all uncompensated hours." Claim No. 72, p.2. Cascia's submission states: "We were continuously promised that we would be compensated for our overtime, hard work and perseverance whenever the company was afraid that we would start looking for employment elsewhere . . . ." *See* Plaintiff's Exh. 6, p.4. And there appears to be no dispute that the Settling Claimants, like many employees, kept track of their hours on a daily basis so that their work hours would be available in the Debtor's books and records.

Further, the Trustee testified that she discussed this issue of promises made to the employees on numerous occasions with, among others, Ahan. With regard to Ahan's position on such promises, the Trustee testified as follows:

> I will say Mr. Ahan on this particular issue has remained consistent throughout this case. He has every time it's been asked of him confirmed that he and Mr. Modanlo made these promises to these employees for stock, to take care of them, to pay their overtime, to pay their time that they had not been paid. It has been a consistent position.

Transcript of 10/17/08 hearing, pp. 70-71, lines 20-25, 1.[6] The Trustee deposed Ahan

on this issue, among others, and his testimony supports the Settling Claimants' claims, at

least to a large extent.  He testified as follows:

> Q.      Generally, with respect to [Ms. Becraft's] claim for overtime, is she an employee who would be entitled to overtime from FAI during the period 1994 through the year 2000?
>
> A.    Yes, I believe she was because those were the promises that were made at that time.
>
> Q.      Let's go to those promises.  When we had this discussed about what was promised to Ms. Becraft, is it also fair to say that the same discussion occurred with respect to Ms. Becraft, Mr. Kavanaugh, Mr. Kisin, Mr. Merritt, Mr. Saunders and Mr. Cascia?
>
> A.      It was made generically to most of the key employees, if not all of them being present at the time that they were made.

Plaintiff's Exh. 11 (Ahan Deposition), p. 31.

> Q.      With respect to conversations with key employees, who were the key employees to FAI?
>
> A.      I'll give you to the best of my recollection because some of them, they're not obviously with the company.
>
> Q.      Sure.
>
> A.      For FAI-SAT 1, we had a software engineer, his name was Rob Adkin, Mark Cascia, Steve Merritt,Tony Saunders, Margaret Becraft, Rex McGill, God bless his soul, he's dead, and Hal Merritt, I believe he's also passed away, and Brian Stepp.
>
> Q.      Smith?
>
> A.      Stepp.

---

[6] Ahan holds a claim in the bankruptcy case that is subordinated to unsecured creditors.  The Trustee points out, correctly in the Court's view, that because Ahan may receive a distribution on that claim if the Settling Claimants' claims are denied in full, he has an economic interest in seeing the Settling Claimants' claims defeated. Therefore, his testimony in support of those claims is against his economic interest, which tends to add to his credibility.

Q.      Is that S-t-e-p-p?

A.      Correct.  Richard Knox.  I believe those were the guys that really they gave it all to make this happen that I can tell you from the top of my head.

Q.      As being key employees for FAI-SAT 1, what additional benefits were discussed with them to incentivize [sic] them to stay or otherwise reward them for their efforts on FAI-SAT 1?

                    **********

THE WITNESS:  Their initial – one of the things was that when we got them on board, their salary was not as high as it could have been for the amount of work that they were performing, so some of them they don't necessarily got that high of a salary that otherwise they would have received if it wasn't for the promises of additional reward and being part of getting the benefit of the company's success.

Q.      Do you recall in what form the additional reward was to be distributed?  Was it through overtime, was it through stock, was it through additional vacation?  If you recall.

A.      It was going to be a combination of benefits from some sort of benefits on giving of stocks or right to some of the company's success through the stock appreciation.
        It was never giving them additional overtime, if that is what you're saying.  They did not receive that promise, but they were going to be rewarded and they would be receiving compensation for all the extra work and effort that they were putting for the company to succeed.

Q.      And that would have been through stock in FAI, stock in FACS or stock in some other entity?

A.      We never were clear on that.  I don't recall that we were ever specific how we were going to reward them, but we always told them that we were going to reward them.

                    **********

        But prior to that [Modanlo and he], we had agreed always we had one of us to speak to the team and with my consent, again he made the representation to them that we were going to make good with our promises and even through they're going through the restructuring, that

22

is not going to have a impact on their previous work that they had done for Final Analysis.

Q.      That conversation would have taken place in approximately the year 2000, early in 2000, because that was the time of the restructure?

A.      That is correct, in the year 2000.

*Id*. at 31-37.

Ahan further testified

I don't recall that we ever told them we were going to straight [sic], which is one times your salary or premium overtime, which is one and a half times their regular salary. We were never clear on that, we only had indicated that we would take care of them and we would pay them for the extra work and the overtime they were putting in. I can't tell you that we ever told them you're going to receive straight time, which is one times your salary, or one and a half times.

*Id*. at 49.

Thus, Ahan's testimony supports the Settling Claimants' contention that they were promised they would be compensated for their overtime work hours. The record also strongly suggests that they relied on these promises in continuing to work for the Debtor.

The record is not altogether clear, however, as to what form of compensation the Settling Claimants would receive for overtime hours. The Settling Claimants point to the definition of "wage" under the Maryland Wage Payment and Collection Law ("MWPCL"), which includes "any other remuneration promised for service." Md. Code Ann., Labor & Employment, §3-501(c)(2)(iv). They contend that a promise of compensation is a "wage" and is payable under the law, and therefore they are entitled to compensation for their overtime hours. The Settling Claimants contend that the compensation should be one and one-half times their normal pay rate, based on the

23

Debtor's employee handbook – which provides that overtime pay for any non-exempt employee of the Debtor is to be paid at one and one-half times salary – and the usual meaning of overtime pay.  They also contend that, under the MWPCL, a court may award treble damages, reasonable attorney fees and costs against an employer that withholds payment of a "wage" in violation of the MWPCL and not as a result of a bona fide dispute, and therefore their compensation claim should be trebled.  *See* Md. Code Ann., Labor & Employment, §3-507(b) (if wage withheld in violation of the MWPCL and not as a result of a bona fide dispute, court "may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs.").

The Objecting Creditors do not respond to these specific arguments regarding how overtime should be compensated.  Rather, they deny that the Settling Creditors were actually promised overtime pay.  In addition, they contend that a three-year statute of limitations applies to the Settling Claimants' claims, which the Trustee does not generally dispute.  But even assuming the applicability of a three-year statute of limitations, any such bar to claims for overtime wages for which the period had not expired was tolled by the filing of the bankruptcy petition against the Debtor on September 4, 2001.  The deadline for the Settling Claimants to bring these claims is extended "until the later of" –

> (1)  the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> (2)  30 days after notice of the termination or expiration of the stay . . . with respect to such claim[s].

11 U.S.C. §108(c).  Thus, assuming that any of the claims at issue in this case are subject to a three-year limitations period, such period would not be a bar to claims that

accrued on or after September 4, 1998, *i.e.*, 3 years before the involuntary petition was filed against the Debtor.

Thus, if September 1998 is the earliest that the claims can date back to, a significant portion of each Settling Claimant's overtime claim accrued after that date.[7] An estimate for the claims during the period September 1, 1998 (assuming 17 weeks for 1998) to March 31, 2000 (the date of termination of the Settling Claimants' employment), generated from the proofs of claim and Trustee's submissions, is as follows:

Becraft: **$15,240** (78 hours (2000) + 312 hours (1999) + 102 hours (1998) x $20.65 x 1.5). *See* Plaintiff's Exh. 1, p.5.

Kavanaugh: **$24,642** (65 hours (2000) + 260 hours (1999) + 119 hours (1998) x $37 x 1.5). *See* Plaintiff's Exh. 2, p.9.

Kisin: **$62,400** (156 hours (2000) + 600 hours (1999) + 204 hours (1998) x $65). Calculation based on 12 overtime hours per week for 50-week years. *See* Plaintiff's Exh. 3, p.6.

Merritt **$65,667** ($10,611 (2000) + $42,444(1999) + $12,612 (est.1998). *See* Plaintiff's Exh. 4, pp.3-4.

Sanders **$16,300** (407.5 hours listed from 9/98 through 3/31/00 x $40). *See* Claim 76, pp. 3-4.

Cascia **$31,565** ($7,162 (actual claim for 2000) + $18,951 (actual claim for 1999) + $5,452 (135.9 actual hours listed for 9/98 to 12/31/98 x $40.12). *See* Plaintiff's Exh. 6 at "Item 6 – 2 of 5".

The foregoing amounts are useful in establishing the lower end of the range of reasonable outcomes of an adjudication of the Settling Claimants' overtime claims when

---

[7] The record before the Court does not allow calculations of total hours or amounts due on a day-by-day basis. Accordingly, the Court will base its calculations on a monthly or weekly basis, as the record allows, beginning with September 1998.

taking into account the likelihood that a factfinder would find that the Settling Claimants were, in fact, promised compensation for overtime. That likelihood is addressed below.

The Settling Claimants, however, dispute that the three-year limitations period bars any of their overtime claims. In submissions to the Trustee, they contend that Modanlo and/or Ahan promised them in 1999 and 2000 that the Debtor would make good on past overtime amounts as a way of inducing them to stay with the Debtor. *See* Plaintiff's Exh. 12(A), pp. 2,4. Ahan's deposition testimony supports this contention.[8] The Settling Claimants contend that they continued to work for the Debtor based on this promise – made during the three year limitations period – to pay past overtime amounts, and that this promise was itself "other remuneration promised for service[,]" and constitutes a "wage" under the MWPCL, §3-501(c)(2)(iv). They further contend that a cause of action accrues when a wage is not paid, and therefore, as a matter of law, the three-year limitations period began to run no earlier than the date this "wage" was promised to them in 1999 and/or 2000. No party offered any authority contradicting this contention.

The Court finds the Settling Claimants' statute of limitations argument to be sound in light of Ahan's testimony and the language of the MWPCL. On this record, the Court places the likelihood of the Settling Claimants prevailing on this argument at between 70% and 85%. The Court therefore calculates the range of likely recovery of the Settling Claimants' overtime claims that arose from the earliest overtime date for

---

[8] *See* Plaintiff's Exh. 11 (Ahan Deposition), p.37 (the Debtor "made the representation to them [in the year 2000] that we were going to make good with our promises and even through they're going through the restructuring, that is not going to have a impact on their previous work that they had done for Final Analysis.")

26

each Settling Claimant through September 1, 1998 (*i.e.* that arose outside the three year

period ending on the date of the petition) as follows:

| | |
|---|---|
| Becraft: | **$61,106 - $74,200** ($102,534 overtime claim minus $15,240 claim post-9/98 = $87,294 x 70% and 85%) |
| Kavanaugh: | **$39,801 - $48,329** ($81,500 overtime claim minus $24,642 claim post-9/98 = $56,858 x 70% and 85%) |
| Kisin: | **$78,820 - $95,710** ($175,000 overtime claim minus $62,400 claim post-9/98 = $112,600 x 70% and 85%) |
| Merritt: | **$96,321 - $116,961** ($203,269 overtime claim minus $65,667 claim post-9/98 = $137,602 x 70% and 85%) |
| Sanders: | **$111,468 - $135,354** ($175,540 overtime claim minus $16,300 claim post-9/98 = $159,240 x 70% and 85%) [9] |
| Cascia: | **$107,002 - $129,931** ($184,425 overtime claim minus $31,565 claim post-9/98 = $152,860 x 70% and 85%) [10] |

Finally, the Court must take into account the possibility that a factfinder might

find that no promises were made to the Settling Claimants that they would be

compensated for their overtime hours.  But having heard Modanlo's explanation of the

overtime issue, as well as Conway's testimony, and taking into account the Trustee's

testimony, the submissions by the Settling Claimants and Ahan's deposition testimony,

the Court finds that a factfinder would more likely than not, by a substantial margin, find

that the Settling Claimants were promised compensation for their overtime hours.  The

Court assesses the likelihood of this outcome at between 60% and 80%.  Applying this

assessment to the amounts in the two preceding tables, the Court finds that the range of

---

[9] Sanders did not submit any information in support of his amended overtime claim when he filed his amended proof of clam and therefore the Court uses the overtime amounts in his original claim.  *Compare* Claim No. 76 with Claim No. 92.

[10] Cascia's overtime claim amounts are taken from Plaintiff's Exh. 6 at "Item 6 – 1 and 2 of 5," which amounts are lower than the overtime claim in his original proof of claim, Claim No. 74. The amount in Claim No. 74 is simply a lump sum figure for the entire claim period, while Plaintiff's Exh. 6 at "Item 6 – 1 and 2 of 5" sets forth monthly overtime amounts and therefore appears to supersede Claim No. 74.

reasonable outcomes of the adjudication of the Settling Claimants overtime claims is as follows:

| | | |
|---|---|---|
| Becraft: | Low: ($15,240 + $61,106) x 60% = **$45,807** | |
| | High: ($15,240 + $74,200) x 80% = **$71,552** | |
| Kavanaugh | Low: ($24,642 + $39,801) x 60% = **$38,665** | |
| | High: ($24,642 + $48,329) x 80% = **$58,377** | |
| Kisin | Low: ($62,400 + $78,820) x 60% = **$84,732** | |
| | High: ($62,400 + $95,710) x 80% = **$126,488** | |
| Merritt | Low: ($65,667 + $96,321) x 60% = **$97,192** | |
| | High: ($65,667 + $116,961) x 80% = **$146,102** | |
| Sanders | Low: ($16,300 + $111,468) x 60% = **$76,661** | |
| | High: ($16,300 + $135,354) x 80% = **$121,323** | |
| Cascia | Low: ($31,565 + $107,002) x 60% = **$83,140** | |
| | High: ($31,565 + $129,931) x 80% = **$129,197** | |

In making this determination, the Court recognizes that assessing the likelihood of success of litigation is an inexact science. The Court also recognizes that other issues which the Court has not directly factored into the above analysis could affect the outcome of a challenge to the Settling Claimants' claims. For example, as identified previously, the Settling Claimants contend that, as a matter of law, their exempt status was converted to nonexempt because the Debtor docked their pay and took other actions, and they therefore were eligible for overtime pay. They also contend that they may be entitled to treble damages under the MWPCL because the Debtor's withholding of wages was not based on a bona fide dispute. Likewise, the Objecting Creditors also make other arguments in support of their objections to the proposed compromises. The Court has considered these other arguments of both the Settling Claimants and the Objecting Creditors and has determined that they do not warrant further weight in the

28

analysis, in some cases because the merit of the arguments is suspect and in other cases because the opposing arguments of the parties tend to balance each other out in the overall analysis.

Having considered these matters, the Court finds that the above range of outcomes constitutes the range of reasonable outcomes that would result from the adjudication of a challenge to the Settling Claimants' overtime claims.

The Court will address the significance of these ranges below.

2. **Stock Claims**

The Settling Claimants' stock claims must first be considered in the context of the Debtor's promises to all employees, not just the Settling Claimants. There is little doubt that the Debtor repeatedly told many, if not all, employees that it would establish some form of employee stock ownership plan, whether in the form of a stock option plan or some other form of stock plan. In that regard, the record established that, at least insofar as all employees were concerned (as opposed to a discrete group of so-called "core" or "key" employees), the Debtor's attitude toward an employee stock ownership plan was along the following lines: The Debtor recognized that many of its employees were committed to achieving success for the Debtor, working very long and hard hours to try to make the Debtor successful. Modanlo and Ahan, as the two stockholders of the Debtor, agreed that they would share the success of the Debtor with the employees. Thus, in the event the Debtor became successful, the employees would be rewarded for their efforts. That reward could take the form of stock ownership in the Debtor or FACS. The Debtor explored but never formally adopted an employee stock ownership

plan.  The Debtor did not reach the level of success where stock ownership would have rewarded the employees for their efforts.  No stock was ever issued to any employee.

The foregoing does not appear to support an actionable claim for money relief based on the Debtor's failure to issue stock for several reasons.  First, although the Debtor had its counsel draft an employee stock option plan, the process of implementing a plan had not been completed when the Debtor's financial struggles resulted in the bankruptcy filing.  The Debtor's failure to complete that process sooner does not seem to have violated any specific actionable promise.  Second, even if the Debtor had adopted such a plan, the stock very quickly became worthless.  In the absence of an established mechanism for issuing marketable stock and realizing whatever value the stock had prepetition (such as a right to put the stock to the Debtor), the adoption of an employee stock ownership plan would not have allowed any employee to realize value from the plan.  The record does not establish that such a mechanism existed.

At least some of the Settling Claimants, however, contend that apart from the general statements made by the Debtor to all employees, the Debtor specifically promised them stock.  But the specific facts which provide the basis for their individual claims differ to some extent.  Since none of the Settling Claimants testified at the hearing, the Court must determine the scope of the promises allegedly made to them from the record and the Trustee's testimony.

Becraft, Kavanagh and Cascia assert their stock claims based on the following:

In a meeting of 10 key personnel of the company, including
myself, Nader Madanlo promised the ten employees a total of 2%
of the company Final Analysis Communication Services Inc.
Divided between 10 people that is 0.2% each.

30

> At the end of the employment period (3/31/00), FACS consisted of
> 15 million shares, so each of these 10 employees should have
> received 30,000 shares.  Also at that time each share was worth
> $35 so the promised figure per person should equal: 30,000 x 35 =
> 1,050,000.

Claim No. 71, p. 2; Claim No. 73, p. 3; Claim No. 74, p. 5.  According to Cascia, the

meeting occurred sometime in 1997.  *See* Plaintiff's Exh. 9 (J).

> Kisin and Merritt base their stock claims on
>
>  a public verbal promise made by Mr. N. Modanlo, FAI President, when
> he said during all hands meeting in 1-st quarter of 1999 that FAI
> allocated 2% of its 15,000,000 shares to key employee personnel.  At that
> time we had about 9 – 10 so-called key employees. Mr. Modanlo also
> publicly mentioned that current stock price was $35.00 a share. Based on
> the above it was concluded that each key employee get about 0.2% shares
> of total FAI stock, at that time roughly $1,000,000 total value per
> employee.

Claim No. 70, p. 2; Claim No. 72, p. 2.  As far as the Court is able to determine, Sanders

has never made a claim for stock in a proof of claim filed with the Court, and has not

asserted a claim greater than $263,310 (for overtime).[11]  Accordingly, the Court will

give no weight to a stock claim in resolving the settlement motion as it applies to

Sanders.

Thus, Becraft, Kavanagh and Cascia contend that they were promised stock in

FACS in a meeting of the key employees in 1997.  Kisin and Merritt contend that they

were part of the group of key employees, and that Modanlo announced at a company-

wide meeting in 1999 that FAI shares had been allocated for the group's benefit,

including them.

---

[11] *See* Claims No.76 and 94.

There is little in the record to support the contention that a specific promise was made to any of the Settling Claimants for a specific amount of stock of either FAI or FACS. Ahan's deposition testimony does not directly support this contention. And the Trustee candidly acknowledged that the basis of the stock claim is not altogether clear:

> Q.: What stock was supposed to be transferred over to the core employees?
>
> A.: That is unclear and I think at the time it may not have been clear in anyone's mind because FACS was owned by FAI and was a subsidiary company and literally the two companies were being run together. So I don't know that anyone could pinpoint that.
>
> I think that the two individuals owned the FAI stock so that could be what they had issue.

 Transcript of 10/17/08 hearing, pp. 101-102.

Based on the record, the Settling Claimants would appear to have great difficulty defending the amount of their stock claims or establishing any value for the claims. The Objecting Creditors contend that even if the Settling Claimants could establish that they were promised stock, the stock they allegedly were promised was worthless. And any party objecting to the Settling Claimants' claims would introduce Conway's testimony that he believed the FACS stock was restricted and could not be sold to any party other than the Debtor. *See* Transcript of 10/31/08 hearing, p. 106. Conway further testified that while he was controller, from July 1998 through July 2001, no employee ever sold stock in FACS or FAI. The Court is not aware of any rebuttal evidence the Settling Claimants could introduce to establish that they could have realized any value from the stock allegedly promised to them.

Although the stock claims are fraught with uncertainty, the Court cannot find that they have no value. At least three of the Settling Claimants stated under penalty of

perjury that a specific promise was made to them that they would be issued stock. Further, Mr. Conway's testimony that the FACS stock was restricted was not unequivocal, [12] and the record suggests that the Debtor's stock was not subject to the same restrictions. In addition, it would be time consuming and costly to the litigants to sort through the various relevant documents, determine the value of the Debtor's stock, and litigate the issue of the promises allegedly made by the Debtor's executive at various times.

Because the claims on their face are so large relative to the Court's assessment of them, the Court is hesitant to place a percentage probability on the likelihood of their success. Any percentage would likely result in a valuation out of proportion to their merit. Taking all this into account, and assuming a ninety percent payout on claims, the Court determines that a rational litigant would agree that the stock claims could be allowed in the amount of $25,000 in order to avoid the time and expense of litigating an objection to them.

The Court therefore finds that the value of the stock claim of each Settling Claimant, other than Sanders, is between zero and $25,000. The Court does not attribute any value to a stock claim for Sanders for the reasons stated above.

### 3. Cascia's Bonus Claim

In addition to his claim for stock and overtime, Cascia asserts a claim for unpaid bonus. His bonus claim is based initially on a letter dated April 4, 1994 from Modanlo as President of FAI, which offered him a "bonus plan based on your activities and based on specific project." Claim No. 74, p.2. It states "[f]or example, the bonus planned for

---

[12] "I believe it was restricted stock." (Transcript of 10/31/08 hearing, p. 106)

the SSTT project is 2% of the total contract price if awarded to FAI."  There are other

documents in the record supporting the contention that a bonus agreement existed

between the Debtor and Cascia.

In Cascia's original proof of claim, he asserted a bonus claim of $1,332,000

based on 2% of the alleged value of eight contracts.  *See* Claim No. 74, p. 4.  In a

document submitted to the Trustee, and admitted as part of Plaintiff's Exh. 6, Cascia

appears to have increased his bonus claim to $18,361,200.  *See* Plaintiff's Exh. 6 at

"Item 6, 4 of 5".[13]  He contends that this amended amount is based on the value of

contracts he obtained for the Debtor and the value of equity investments he arranged for

the Debtor.

However, Modanlo and Conway testified about each contract for which Cascia

seeks a bonus.  They testified that the value of the contracts to the Debtor was zero or

negligible.  Neither Cascia nor the Trustee offered any contrary evidence or testimony.

Accordingly, the Court is unable to make any assessment of Cascia's bonus claim.  The

Court gives no weight to Cascia's bonus claim for purposes of the settlement motion.

### 4.  Conclusion Regarding Probability of Success

The Trustee seeks to settle the claims for the following amounts:

- Becraft's claim - $152,534.44

- Kavanagh's claim - $81,500

- Kisin's claim - $175,000

- Merritt's claim - $203,269.44

- Sanders's claim - $175,540

---

[13] This document was not filed with the Court as an amendment to his claim.

- Cascia's claim - $325,589

The Court finds that the range of reasonable outcomes attributable to each of the

Settling Claimants' claims is as follows:

| Claimant | Overtime Claim (Low -High Range) | Stock Claim (Low-High Range) | Total Claim (Low-High Range) |
|---|---|---|---|
| Becraft | $45,807 – $71,552 | 0 - $25,000 | $45,807 - $96,552 |
| Kavanagh | $38,665 - $58,377 | 0 - $25,000 | $38,665 - $83,377 |
| Kisin | $84,732 - $126,488 | 0 - $25,000 | $84,732 - $151,488 |
| Merritt | $97,192 - $146,102 | 0 - $25,000 | $97,192 – $171,102 |
| Sanders | $76,661 - $121,323 | 0 | $76,661 - $121,323 |
| Cascia[14] | $83,140 - $129,197 | 0 - $25,000 | $83,140 - $154,197 |

The Trustee's proposed settlement with Kavanagh falls within the range of

reasonable outcomes of the ultimate resolution of the objections to his claims.  The

Trustee's proposed settlement with the remaining Settling Claimants falls outside the

range of reasonable outcomes of an ultimate resolution of the objections to their claims.

Accordingly, unless the application of the other three factors alters these conclusions,

the Court will approve the settlement with Kavanagh and deny the settlement with the

remaining Settling Claimants.

**B.    Difficulty of Collection**

This is not a factor here because the claims that are being settled will result in a

payment from the estate, not a recovery to the estate.

**C.    Complexity and Expense of Litigation**

This is often a very significant factor in a Court's determination whether to

approve a Chapter 7 trustee's settlement, as a Chapter 7 trustee's costs to litigate can be

---

[14] As explained above, the Court can give no weight to Cascia's bonus claim for purposes of the proposed settlement.

a substantial drain on estate resources. The Trustee argues that the complexity and expense of the litigation would be high, as she would have to identify and analyze legal issues concerning the Fair Labor Standards Act and the MWPCL, exempt versus nonexempt employee status, statute of limitations and tolling issues, treble damage claims for unpaid wages, statute of frauds, valuation of a complex company at various times, and restrictions on closely held stock, among other issues. And she would have to do so dealing with various parties in this case who have often been adverse to her or, at best, uncooperative. These are certainly valid points.

Here, however, the Objecting Creditors filed objections to the Settling Claimants' claims and are prepared to prosecute those objections. Thus, the costs of litigating the objections to the claims can be borne primarily by the Objecting Creditors, not the estate. Given the magnitude of the Settling Claimants' claims as compared to the amount available for distribution, it is doubtful that the Trustee could avoid any involvement in the adjudication of the claims, but the Trustee's involvement in the litigation could be limited. Under these circumstances, the usual concern for the expense of litigation is substantially mitigated. Of course, to the extent the time and cost of the parties other than the estate are a factor or the interest of preserving judicial resources is considered, this factor would weigh in favor of approving the settlement.

The Court concludes that this factor is neutral to its analysis. Because the Objecting Creditors are prepared to prosecute the objections to the Settling Claimants' claims, the cost to the estate can be limited. Nevertheless, a fair and equitable settlement will allow all parties to avoid costly and complex litigation.

### D.    Interest of Creditors

The Trustee emphasizes that if the Settling Claimants are awarded their original claimed amounts, the payout to the unsecured creditors of the FAI estate will drop from 80-90 percent to 30 percent or less.  The Trustee argues that she owes a primary duty to the unsecured creditors who are to benefit from the proposed settlement.  *See In re Krizmanich*, 139 B.R. 456, 459 (Bankr. N.D. Ind. 1992).

This factor weighs in favor of approving a fair and equitable settlement.  First, approval of the settlement would result in resolution of the claims, and would bring this case closer to a final resolution and distribution to unsecured creditors.  Second, the settlement would provide certainty to the unsecured creditors.  It would eliminate any risk that the Settling Claimants' substantial claims could be upheld and the obvious dilution in value of distributions to unsecured creditors that would result.

However, considering the Court's findings on the likelihood of success of the claims objections and that the bulk of the costs of pursuing the objections to the claims will not be borne by the estate, the interests of unsecured creditors are not served by approving the settlement in its present amount for any Settling Claimant other than Kavanagh.  Timing and certainty of distribution, while certainly important considerations, do not outweigh the likely additional recovery that will be realized by the creditors on a *pro rata* basis if, as appears likely, the ultimate resolution of the Settling Creditors' claims would be less than the amount of the Trustee's settlement.  A reduced amount will mean a greater payout to all other unsecured creditors on a *pro rata* basis, and the amount currently held by the Trustee for distribution will not be significantly diminished by litigation costs.  The Court finds that all creditors in this

37

case, other than the Settling Claimants, stand to benefit from denial of the proposed settlement other than as to Kavanagh.  At the same time, the Court notes that all creditors, including the Objecting Creditors, stand to benefit from approval of a compromise that falls within the range of reasonable outcomes described herein.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant the motions with regard to the Trustee's proposed settlement with Kavanagh.  The Court will deny the motions as they apply to the proposed settlements with the other Settling Claimants.  And, while the Court has no authority to force any of the Settling Claimants to accept a settlement on any other terms, the Court notes that it would approve settlements with the remaining Settling Claimants that fall within the range of outcomes set forth on page 35 herein.

## Copies to:

James M. Hoffman, Esq.
Shulman, Rogers, Gandal, Pordy & Ecker
11921 Rockville Pike, Suite 300
Rockville, MD 20852

U.S. Trustee's Office
6303 Ivy Lane – Suite 600
Greenbelt, MD 20772

Cheryl E. Rose, Esq.
50 W. Edmonston Dr. – #600
Rockville, MD 20852

Steven Merritt
307 Cedar Avenue
Edgewater, MD 21037

James Sanders
1583 Snug Harbor Rd.
Shady Side, MD 20764

Alexander Kisin
11606 Toulone Dr.
Potomac, MD 20854

Richard E. Kavanagh
601 Ford Road
Deale, MD 20751

Margaret Becraft
6113 Seminole St.
Berwyn Heights, MD 20740

Merrill Cohen, Esq.
7910 Woodmont Ave. – #760
Bethesda, MD 20814

Joseph Suntum, Esq.
Miller, Miller & Canby
200-B Monroe St.
Rockville, MD 20850

Joel S. Aronson, Esq.
3 Bethesda, Metro Center – #650
Bethesda, MD 20850

Edward Tolchin, Esq.
10509 Judicial Dr. – #300
Fairfax, VA 22030

Richard M. Goldberg, Esq.
36 S. Charles St. – #2000
Baltimore, MD 21201

Mark Cascia
1200 Thompson Creek Road
Stevensville, MD 21666

Christopher Mead, Esq.
London & Mead
1225 19th St., NW – #320
Washington, DC 20036

Ali Aladpoush
2475 Virginia Ave., NW
Washington, DC 20037

Jan W. Friis, Jr.
9917 Derbyshire Lane
Bethesda, MD 20817

Karl E. Olsoni, Jr.
1622 Leslie Lane
Lake Oswego, OR 97034

Lawrence Spedden
2717 Boudwin Avenue
Boothwyn, PA 19061

William G.J. Conway
8701 Oxwell Lane
Laurel, MD 20708

Yakov Segel
15 Oak Hill Court
Owings Mills, MD 21117

Sharon Edwards
4922 43rd Ave.
Hyattsville, MD 20781

Sandra Danzig
1103 Kennedy St.
Falls Church, VA 22046

Tatiana Lawrence
8215 Wolftrap Road
Vienna, VA 22182

**END OF MEMORANDUM OF DECISION**