Date signed November 09, 2012



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
at GREENBELT

| | | |
|---|---|---|
| In Re: | * | |
| | * | Case No.   01-21039-TJC |
| FINAL ANALYSIS, INC. | * | Chapter   7 |
| | * | |
| Debtor | * | |

### MEMORANDUM OF DECISION

International Research Centre Gloria Polyot ("Claimant") filed a proof of claim asserting that debtor Final Analysis Inc. ("Debtor") owes it $230,000 for an unpaid contractual obligation. Nader Modanlo ("Modanlo"), the former president of Debtor, objects to the claim. The primary dispute between the parties is whether Debtor previously paid Claimant's co-contracting party the amount due under the contract, thereby satisfying the contractual obligation, or whether the payment was for some other purpose. Now, before the Court are the parties' cross-motions for summary judgment. The Court held a hearing on the cross-motions on October 23, 2012, and gave Claimant until November 5, 2012, to submit any additional affidavits in support of its

1

position. No further filings were made. The Court concludes that there are no material facts in dispute and Modanlo is entitled to judgment as a matter of law. Accordingly, the Court sustains Modanlo's objection and the claim is disallowed.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334, 157(a) and Local Rule 402 of the United States District Court of the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(B).

*Material Facts Not in Dispute*

*The Parties*

Debtor is an engineering company founded in 1992 by Modanlo and Michael Ahan. Creditors of Debtor filed an involuntary petition against it under Chapter 7 of the Bankruptcy Code on September 4, 2001. The Court entered an order for relief on October 16, 2001, and Cheryl Rose (the "Trustee") was appointed the Chapter 7 trustee shortly thereafter and has continued to serve in that capacity.

Prior to the petition, Debtor joined forces with Claimant and Polyot Design Bureau ("DB Polyot") to establish a satellite communications system. Claimant is a Russian company that was formed by Dr. Alexander Ilyin ("Ilyin") in 1993. It is also known as and referred to in the documents before the Court as "Gloria Polyot," "IRC Gloria Polyot," and "ZAO MITs Gloria-Polyot." Ilyin owns and controls Claimant, and serves as its president.

DB Polyot develops technology and is capable of providing launch services for satellites. It is also known as and referred to in the documents before the Court as "Design Bureau Polyot," "Polyot Design Bureau," "KB Polyot," "GUDP KB Polyot." DB Polyot is a wholly owned subsidiary of Federal State Unitary Production Company PO Polyot ("PO Polyot" or "FGUP PO Polyot"). Both DB Polyot and PO Polyot are Russian state-owned.

Ilyin worked at DB Polyot for approximately 30 years until December 1997, at which time he served as its chief designer. Claimant is not related to DB Polyot or to PO Polyot, other than the fact that Ilyin is the principal at Claimant and was previously the chief designer at DB Polyot.

*The Contract Obligation*

In 1995, Debtor entered into a contract with DB Polyot "and/or" Claimant to provide support services in connection with Debtor's launch of the FAISAT-2v satellite (the "1995 Agreement"). It is signed by Modanlo on behalf of Debtor and by Ilyin on behalf of DB Polyot and Claimant.

In November 1997, the same parties entered into a second agreement to resolve Debtor's final payment obligations under the 1995 Agreement (the "1997 Agreement"). The 1997 Agreement provides that Debtor will pay $230,000 in various installments through November 1998 (the "Contract Obligation"). Again, Modanlo signed the agreement on behalf of Debtor, and Ilyin signed it on behalf of DB Polyot and Claimant.

The non-debtor parties to the agreements are DB Polyot "and/or" Claimant. As written, and as previously ruled by the Court, payment by Debtor to DB Polyot *and/or* Claimant would satisfy the Contract Obligation. Here, the dispute is whether Debtor paid DB Polyot for the Contract Obligation, or whether Debtor remains obligated to pay it. DB Polyot has never filed a claim for the Contract Obligation, and the claims bar date passed long ago.

*The May 1998 Payment*

After Ilyin left the employment of DB Polyot in December 1997, representatives of PO Polyot and DB Polyot met with Debtor's management, including Modanlo. Modanlo Ex. 2 at ¶8. Yakov Segel ("Segel"), who worked for Debtor from 1994 to 2006, was present at the meetings.

*Id*. DB Polyot represented to Debtor that it was the true entity that had provided services and products to Debtor, and that it was the legitimate recipient of the Contract Obligation. *Id*. Debtor and DB Polyot agreed to a revised payment schedule for the Contract Obligation in an agreement entered on February 13, 1998 ("1998 Protocol"). *Id*. The 1998 Protocol provides that the payment of the Contract Obligation would be made in two final installment payments.[1]

On or about May 4, 1998, Oleg Petrovich Dorofeev, a representative of DB Polyot and General Director of PO Polyot, wrote to Modanlo providing the bank account information so that Modanlo could complete the funds transfer. Modanlo Ex. 11. The letter stated that, upon payment of the funds, the Debtor "will have satisfied all outstanding financial obligations," including the Contract Obligation. *Id*. Debtor wired $230,000 to the indicated bank account of a company named SARD (the "May 1998 Payment"). Modanlo Ex. 12. The funds transfer request was signed and faxed on May 5, 1998, but the posting date for the transaction was May 11, 1998. Segel's affidavit states that the May 1998 Payment was in satisfaction of the Contract Obligation.

In Russia, a dispute arose between Claimant and DB Polyot over the Contract Obligation. Docket No. 1336-1 at ¶2. Apparently, in an effort to resolve the dispute, DB Polyot drafted the "Verification Act" describing the mutual payments between DB Polyot and Claimant.[2] The Verification Act stated that DB Polyot received $230,000 as a final payment for the Contract

---

[1] Segel also states in his affidavit that in April 1998, Modanlo and Segel travelled to Moscow and met with Ilyin. Ex. 2 at ¶9. Modanlo told Ilyin that DB Polyot represented that it was the true and legitimate recipient of the Contract Obligation and that the Debtor did not owe anything to Claimant. *Id.* Segel's affidavit states that "Not only did Dr. Ilyin not raise any objection or disagreement; rather, he unequivocally affirmed that neither he nor IRC Gloria Polyot has any dispute with, or claim against FAI." *Id*.

[2] The copy of the Verification Act has handwritten notes. It appears that the Verification Act was originally drafted on November 25, 1998, but Ilyin later edited it by hand so that it would purport to be drafted on September 25, 2003. The edited version of the Verification Act was sent with a cover letter to V. V. Markelov, Chief Designer of DB Polyot, on September 25, 2003. Ilyin admits in an affidavit signed on July 16, 2012, that he did not have an unedited copy of the Verification Act, but that he could provide the edited version. *See* Modanlo Ex. 15.

4

Obligation.  Modanlo Ex. 13.  On December 3, 1998, S.G. Zaharchev, Claimant's General Director and Ilyin's former partner, sent a letter declining to sign the 1998 Verification Act.  Instead, Claimant requested to see a copy of the 1998 Protocol and proof of the May 1998 Payment.

*Russian Criminal Investigation and Russian Litigation*

The record is unclear as to what occurred for the next two years between the parties.  On January 19, 2001, Ilyin sent a letter to the Russian prosecutor's office requesting an investigation on whether PO Polyot committed a crime when it directed Debtor to make the May 1998 Payment in the name of SARD.  Claimant Ex. 6.

On February 14, 2001, the senior investigator in the Omsk Prosecution Office, S.G. Shiryaev, responded to Ilyin's letter.  Claimant Ex. 7.  In Shiryaev's letter, he stated that his investigation discovered that the $230,000 had been received by SARD according to an agreement between DB Polyot and SARD, on one hand, and Debtor, on the other, dated February 13, 1998 (the "SARD Contract").  *Id.*  He also pointed to the "Conformation," dated April 30, 1998, in which the parties verified that SARD and DB Polyot performed all services under the SARD Contract and the Debtor had transferred a payment (*i.e.* the May 1998 Payment) for the SARD Contract.[3]  In light of these documents, Shiryaev concluded that "the fact that DB Polyot or SARD had illegally received the 230 thousand USD that belonged to Gloria Polyot haven't been proven." *Id*.

Upon receipt of Shiryaev's response, Ilyin and Zaharchev sent a second letter to the Russian prosecutor's office.  Claimant Ex. 8.  In this second letter, Ilyin remarked on Shiryaev's refusal to start a criminal case.  Ilyin argued that an original copy of the SARD Contract with

---

[3] Modanlo, on behalf of Debtor, purportedly signed the Sard Contract and Conformation.  Claimant Exs. 3 and 4.

signatures does not exist, and that no work was actually performed under this alleged contract. Furthermore, Ilyin contended that Shiryaev failed to interpret the documents correctly. On April 12, 2001, Senior Counselor of Justice, N.K. Radovich responded and stated that a second investigation was conducted, but he did not find grounds to reverse the earlier decision. *Id.* Thus, the Russian prosecutors refused to start a criminal investigation.

While Ilyin was awaiting response to his second letter to the prosecution office, he sent an email to Modanlo on February 19, 2001. Claimant Ex. 9. In that email, Ilyin remarked that Polyot had submitted the SARD Contract to the prosecutor's office, and it appeared that Debtor had only made a payment on the SARD Contract, and therefore had not paid the Contract Obligation.[4] Ilyin also requested that Modanlo pay Claimant $230,000 immediately in satisfaction of the Contract Obligation. On February 20, 2001, Modanlo responded and stated that a confidentiality agreement barred him from discussing the matter, and that he did not want to get involved in a dispute that was solely between Claimant and DB Polyot and PO Polyot. Modanlo also sent another email on March 5, 2001, stating that Debtor met all of its contractual obligations and that Claimant's payment issues should be addressed to Polyot.

On April 3, 2001, Oleg Petrovich Dorofeev and Vasily Gorlov, the FAISAT Program Manager of DB Polyot, sent a letter to Debtor's outside counsel, George Grammas, Esq., confirming payment of the Contract Obligation. The letter stated:

> PO Polyot refers Final Analysis to the Protocol of meeting dated as of February 13, 1998, which acknowledged that Final Analysis was obligated to make a final payment of $230,000. This amount was paid in 1998 as required by the Schedule. No further amount is payable to PO Polyot with respect to FAISAT-1 and FAISAT-2v. Furthermore, PO Polyot has

---

[4] Ilyin argues that Modanlo provided the SARD Contract to the Russian prosecutors. While it is apparent that this issue was the subject of extensive litigation in the Montgomery County Circuit Court action, none of that record was put before the Court that establishes Modanlo's role in the creation or submission of the SARD Contract and the Conformation.

>confirmed that the acknowledgments of payment receipts attached to this letter accurately reflect payments received from Final Analysis by PO Polyot.

Modanlo Ex. 17. The authenticity of this letter is confirmed in Segel's affidavit, which states, "On or about April 3, 2001, in response to FAI's request for confirmation of payments . . . . I was present at the time this confirmation letter was signed by Oleg Petrovich Dorofeev, PO Polyot's General Director, and by Vasily Gorlov, Design Bureau Polyot's Deputy Chief Designer." Modanlo Ex. 2 at ¶12. Grammas later requested the Russian prosecution office to confirm the validity of the letter from Dorofeev. The same prosecutor who completed Ilyin's second request for investigation, Senior Counselor of Justice, N.K. Radovich, sent a letter on December 17, 2001, to Grammas confirming "the validity of this letter" from Dorofeev. Modanlo Ex. 18.

On April 8, 2002, Markelov sent a letter to Ilyin and Zaharchev. Modanlo Ex. 19. This letter notified Claimant, among other things, that DB Polyot confirmed receipt of the May 1998 Payment in satisfaction of the Contract Obligation. On May 6, 2002, Ilyin responded to the letter and stated that he did not authorize final payment of the Contract Obligation under the 1998 Protocol and that agreement does not affect Claimant's rights.[5]

On July 6, 2004, Claimant filed suit in Russia against PO Polyot and DB Polyot for the May 1998 Payment and other amounts ("Russian Litigation"). Docket No. 1319-2. Claimant did not name SARD or Dorofeev in the Russian Litigation because the crux of the suit was for money owed by DB Polyot and PO Polyot to Claimant, not whether Debtor made a payment to the wrong company. *Id*.

---

[5] Both letters between Ilyin and Markelov indicate that there were still ongoing business relations between Claimant and DB Polyot, and that the Contract Obligation was not the only contract issue between the parties. It also appears that money was due between the parties on other contracts.

On September 12, 2005, the Arbitrazh Court of Omsk Region denied Claimant's request for relief and held:

> This Court legitimately dismissed the claim to recover the amount of 230,000 US dollars received by the defendant, basing its decision on the act of verification dated 25.09.2003, as unsubstantiated by the plaintiff, by the third party on behalf of the plaintiff as well as the plaintiff's right to it. In accordance with the agreement between the Final Analysis and KB "Polyot" or "Gloria–Polyot" (to implement the launch of FAISAT-2), the copy of which, certified by Oktyabrsky Court of the city of Omsk, is on file, the plaintiff has no rights and obligations as the general contractor or as the customer, and KB PO "Polyot" as the subcontractor. Both parties are equal contractors. This Court dismissed the claim on recovery of losses (in the amount of 230,000 US dollars) due to the expired statute of limitations and due to the fact that the claim was unsubstantiated.

Modanlo Ex. 14 at 7.

On December 29, 2005, the Federal Arbitrazh Court of West-Siberian Region confirmed the September 12, 2005 decision of the Arbitrazh Court of Omsk Region, finding that the lower "court legitimately dismissed the claim to recover the losses in the amount of [$230,000]. The plaintiff failed to prove that this money belonged to him as well as the fact of receipt of this amount from the plaintiff or from a third party." Modanlo Ex. 23 at 4-5. On April 21, 2006, the Supreme Arbitrazh Court of the Russian Federation denied Claimant's final appeal and affirmed the lower appellate court's ruling. Docket No. 1321-6.

*U.S. Litigation*

Litigation in Montgomery County, Maryland commenced in April 2001. The shareholders of the Debtor's affiliate, Final Analysis Communication Systems, Inc. ("FACS"), among others, brought derivative claims against FACS, Debtor, and Modanlo. The plaintiffs alleged numerous acts of misappropriation, fraud, and breach of fiduciary duty on the part of Modanlo and Debtor. After Debtor filed bankruptcy, the Trustee filed claims on behalf of the Debtor against Modanlo, including a claim that Modanlo misappropriated the $230,000 that

comprise the May 1998 Payment. The Montgomery County litigation also included counterclaims and third party claims.

After a week-long trial, the jury found, *inter alia*, Modanlo liable on the Debtor's claims and awarded the Debtor $1,297,000, including $230,000 for misappropriation of corporate funds and the balance for fraud. Claimant Ex. 10 at 5-6. Following the jury verdict, FACS and Modanlo sought a new trial or, in the alternative, a revised judgment. Other parties sought various forms of injunctive relief, including appointing a receiver to FACS. Ultimately, among other things, the Circuit Court for Montgomery County, Maryland vacated the jury verdict.

To aid in making a decision on the injunctive relief requested, the Circuit Court appointed James Cromwell ("Cromwell") as an independent investigator to fully investigate all claims raised against Modanlo and his ability to manage FACS. Modanlo Ex. 25. Cromwell investigated the claims for approximately three months. He reviewed seventeen volumes of trial transcript, materials, and exhibits. He also retained experts to assist him in areas of accounting and business valuation, specifically Thomas Raffa ("Raffa"), a certified public accountant. Raffa had previously been retained to investigate allegations of fraud by Mondanlo and Debtor. According to the Circuit Court, Raffa was

> told that a number of receipts from Polyot were probably forgeries. He was informed that one or more of the contracts relating to the launch services agreement was almost certainly forged. He was aware that the allegations went back as far as 1995. As a result of this information, he determined to ignore the receipts as evidence of money received. Further, except in an effort to gain a general understanding about the agreement between the parties, he attached little weight to the contracts.
>    Instead, he decided to concentrate on tracing the flow of money. He endeavored to identify all payments and receipts made by FAI and FACS to determine from a review of both company's records if monies were actually paid or received and if services or goods were rendered for those payments. . . . As more particularly described in his report, he verified the payments and receipts against bank statements, master vendor lists, and wire or bank transfers.

Modanlo Ex. 25 at 28-29.

>Raffa also examined the allegation of fraud involving payments made to DB Polyot:

>>Accordingly, he looked at all payments made to Polyot. Based upon his examination of the records of FAI and FACS, he determined and identified all monies that were allegedly paid to Polyot and when they were paid. He then endeavored to confirm directly with Polyot that those monies had been received by them. Because of the existence of so many forged documents in the case, he decided that the best way to determine if Polyot had received these monies was by speaking directly to the person at Polyot responsible for keeping such information. He did this though a series of phone calls. In his professional experience, this is a method that is used frequently when dealing with foreign corporations.
>>\* \* \* \* \*
>>The first contact arranged by FACS was with Polyot's general counsel, Alexander Aleksanderov. He was unable to answer Raffa's specific questions. He arranged for him to speak to Polyot's bookkeeper and chief accountant, Elena Polyevko. Mr. Raffa recalled that in one of the first conversations with Ms. Polyevko, he had apparenty reached her at home because she was unable to answer many of his questions. The answers required access to her books and records of Polyot which apparently she did not have at that time. Mr. Raffa opined that this early inability to answer questions provided some evidence that the person with whom he was speaking was making an honest effort to answer his questions. He felt that if they were going to lie to him, they would have been ready for his call and have rehearsed their answers.
>>  Ultimately, he was able to have an extensive conversation with Ms. Polyevko through the assistance of an interpreter. Using the launch services agreement only as a guide, he questioned her as to what payments Polyot had received, when they were received, and in some instances how they were received. That is, whether they were received by cash or wire transfer. He did not ask her leading questions . . . He asked only open-ended questions. In this fashion, Mr. Raffa confirmed that all payments referenced in FACS and FAI's records were received by Polyot, except for a discrepancy of approximately $25,000. Considering the amounts involved, Mr. Raffa did not feel this discrepancy was significant.

Modanlo Ex. 25 at 30-31. Raffa also made blind unexpected phone calls to DB Polyot to verify the information that he gathered, and he was convinced that the information was credible. *Id.* at 31.

>In Cromwell's Report and Recommendation to the Circuit Court, he stated that:

10

> Mr. Raffa has found no evidence of any wrongdoing or misappropriation of FACS' or FAI's monies by Mr. Modanlo. In fact as part of his fraud audit, Mr. Raffa confirmed directly with Polyot its receipt of the contract sums due from FACS and/or FAI, including cash payments which had been alleged not to have been made. For procedural reasons, Mr. Raffa's testimony was not presented to the jury.

Modanlo Ex. 26, Report and Recommendations of James Cromwell, Esq. Regarding Claims Against Nader Modanlo and New York Satellite Industries, LLC, at 4, n. 3. Cromwell was "satisfied with the results of [Raffa's] fraud audit and share[d] Mr. Raffa's conclusions." *Id*. at 4. The Circuit Court found the examination of the books and records reasonable and credible. Modanlo Ex. 25 at 33.

Although the Circuit Court accepted Cromwell's findings, it found "problematic" the stipulation of forged documents and the evidence that demonstrated "that there are material disputes of fact about Modanlo's culpability in this case" and. *Id*. at 42. However, over the derivative shareholders' objections, a settlement was reached and the Circuit Court dismissed the complaint against Modanlo. Modanlo Ex. 26. This decision was appealed by the derivative shareholders, which the Maryland Court of Special Appeals dismissed on September 7, 2010. Modanlo Ex. 28.

*Modanlo's Claim*

As described above, the derivative shareholder claims against Modanlo and FACS were resolved by settlement. The Trustee and Modanlo reached a separate settlement of the claims filed by the Trustee against Modanlo. In sum, that settlement, approved by this Court,[6] required Modanlo to pay the Trustee $250,000 in exchange for the Trustee dismissing the claims against Modanlo pending in the Circuit Court. The Trustee also agreed that Modanlo would retain a

---

[6] Order Approving Compromise with Nader Modanlo, FACS, and New York Satellite Industries, LLC, Docket No. 456; Application to Compromise Controversy, Docket No. 446-1.

claim in Debtor's case, but it would be subordinated to the claims of the general unsecured creditors, but above the equity holders.  In the event the Trustee recovered sufficient funds to pay the claims of the general unsecured creditors in full, Modanlo's claim would be allowed as a general unsecured claim.  The settlement also specifically stated that Modanlo would not be limited in any way from contesting proofs of claims filed by any creditor.  Lastly, the settlement stated neither party admitted to liability or wrongdoing.  Docket No. 446-1, ¶11.

The amount recovered by the Trustee is sufficient to pay the unsecured claims in full only if the Claimant's claim is disallowed.  Therefore, Modanlo will receive a distribution in this case only if his objection to the claim is sustained.

*Conclusions of Law*

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (incorporated here by Fed. R. Bank. P. 7056.); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *In re French*, 499 F. 3d 345, 351-352 (4th Cir. 2007).  The court must consider all evidence in a light most favorable to the nonmoving party. *See Anderson*, 477 U.S. at 255 (all justifiable inferences are drawn in the non-movant's favor).

> In evaluating a summary judgment motion, a court "must consider whether a reasonable [fact-finder] could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant." *Apex Express Corp.*, 190 F.3d at 633.  In doing so, a court is not entitled to either weigh the evidence or make credibility determinations.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of liegimate inferences from the facts are jury functions, not those of a judge").  If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180 (4th Cir. 2004).

*French*, 499 F.3d at 351-352.

At the same time, the mere existence of an alleged factual dispute does not defeat a motion for summary judgment; rather the standard requires that there be no genuine issue of *material* fact. *Anderson,* 477 U.S. at 247-48.  Only disputes over the facts that might affect the outcome of the lawsuit under applicable law will preclude entry of summary judgment. *Id.* Therefore, once a motion for summary judgment is made and supported as provided, the non-moving party must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The non-movant may rely on any evidentiary materials listed in Rule 56(c), except the motions themselves. *Celotex*, 477 U.S. at 325.  If reasonable minds could differ as to the import of the evidence, summary judgment cannot be granted. *Anderson* at 248.

Under Fed. R. Bankr. P. 3001, a "proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f).  Section 502(a) of Title 11 of the United States Bankruptcy Code[7] provides that a "claim…proof of which is filed under §501…, is deemed allowed, unless a party in interest… objects." §502(a).  Section 502(b) provides that if an objection is made, the Court shall allow the claim except to the extent it is disallowable under one of the nine enumerated grounds for disallowing the claim contained therein.  §502(b).  A properly executed and filed proof of claim "is sufficient to shift the burden of producing evidence and to entitle the claimant to share in the distribution of the bankrupt's estate unless an objector comes forward with evidence contradicting the claim." *In re Gates*, 214 B.R. 467, 472 (Bankr. D.Md. 1997).

*The Purpose of the May 1998 Payment*

---

[7] Hereinafter, all statutory citations are to 11 U.S.C. §101, *et seq.*, as currently in effect unless otherwise noted.

There is no dispute between the parties that, at the time they entered into the 1997 Agreement, Debtor had received services to which it was entitled under the 1995 Agreement and was obligated to pay the Contract Obligation. Modanlo's objection asserts that the May 1998 Payment satisfied that obligation. The dispute then is whether the May 1998 Payment was made in satisfaction of the Contract Obligation or for some other obligation or purpose.

The Court concludes that no material issue of fact exists that the May 1998 Payment was made in satisfaction of the Contract Obligation. The record is overwhelming on this point. The 1995 and 1997 Agreements were between Debtor and DB Polyot "and/or" Claimant. Thus, Debtor could satisfy the Contract Obligation by paying either party, and could accept payment instructions from either party as well. It accepted payment instructions and made the May 1998 Payment according to those instructions. Those instructions expressly provided that the payment would satisfy the Contract Obligation. DB Polyot admitted in the Verification Act that the May 1998 Payment satisfied the Contract Obligation, and has sent numerous letters to that same effect, as described above. No witness has been proffered who would testify that the May 1998 Payment was not in satisfaction of the Contract Obligation. Segel's affidavit affirms this purpose of the May 1998 Payment. The same conclusion was reached by Cromwell, the independent investigator appointed by the Circuit Court, and Raffa, the forensic examiner in those proceedings. Further, according to an undated copy of an affidavit of Ilyin submitted by Claimant, when Ilyin asked Modanlo for the $230,000 payment, Modanlo told him that "[Debtor] satisfied its [Contract Obligation] by paying $230,000 to a company named SARD . . . ." Claimant Ex. 5 at 9. Thus, even Ilyin would testify that Modanlo told him the May 1998 Payment satisfied the Contract Obligation. In light of the foregoing and the record before this

Court, the Court concludes that no material issue of fact exists that the May 1998 Payment was made in satisfaction of the Contract Obligation.

Claimant contends that a disputed issue of material fact exists because the Russian prosecutor relied on documents purportedly executed by Modanlo that stated that the May 1998 Payment satisfied the SARD Contract. Viewing these facts in a light most favorable to Claimant, it still does not defeat Modanlo's motion for summary judgment. Whatever may be said about Modanlo's actions, the undisputed fact remains that DB Polyot – the party to whom the payment was due – has repeatedly stated that the May 1998 Payment was in satisfaction of the Contract Obligation. The primacy of this point seems not to be disputed by Claimant. During the extended discovery disputes leading to the cross-motions, Claimant expressly stated

> I would ask the Court to require Mr. Modanlo to produce just one, any single document reflecting that DB Polyot contended in Russia that the money it received, the $230,000, was received in payment on FAISAT-2v. If they produce that document and it's authentic, we're out of here.

Dec. 22, 2011 Hr'g. Tr. at 89. Once the discovery disputes were finally resolved and Claimant produced documents from the Russian proceedings, it produced a number of documents, identified above in the factual discussion, "reflecting that DB Polyot contended in Russia that the money it received, the $230,000, was received in payment on FAISAT-2v." *Id*. By Claimant's own words, that would seem to end the inquiry for this proceeding.

If the resolution of the cross-motions depended on Modanlo's credibility, they would be denied and a trial date would be set. But they do not. The cross-motions are resolved by the statements by DB Polyot that the May 1998 Payment satisfied the Contract Obligation, as attested to in Segel's affidavit and verified by Cromwell and Raffa, and considering that no witness will testify otherwise.

*Judicial Estoppel and Equitable Relief*

15

Claimant contends Debtor would be judicially estopped to contend that the May 1998 Payment satisfied the Contract Obligation because it asserted otherwise against Modanlo in the Montgomery County litigation. Claimant argues that since Debtor would be estopped, so should Modanlo. This Court disagrees.

A party is judicially estopped if the following three elements are satisfied:

> First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation. The position at issue must be one of fact as opposed to one of law or legal theory. Second, the prior inconsistent position must have been accepted by the court. Lastly, the party against whom judicial estoppel is to be applied must have intentionally misled the court to gain unfair advantage. This bad faith requirement is the determinative factor.

*Whitten v. Fred's, Inc.*, 601 F.3d 231, 248 (4th Cir. 2010) (citing *Zinkand v. Brown*, 458 F.3d 634 (4th Cir. 2007)). Judicial estoppel does not apply here. Debtor's factual contentions that Modanlo made the May 1998 Payment for a purpose other than to satisfy the Contract Obligations were never "accepted" by the Circuit Court. Although the jury initially found against Modanlo and in favor of the Debtor, the Circuit Court vacated the jury verdict, and the parties then settled the dispute. Debtor and Modanlo ultimately entered into a settlement agreement that expressly denied liability by all parties. Docket No. 446-1 at ¶11. The settlement agreement also provides that the payments being made by Modanlo to Debtor were "solely in consideration for the releases set forth" in the agreement. *Id*. at ¶4. Thus, the elements of judicial estoppel are not met as to the Debtor, even without regard to the lack of any basis to claim the Trustee acted in bad faith or to intentionally mislead the court. Moreover, with respect to Modanlo, he was a *defendant* in the Montgomery County litigation. Rather than adopting the factual allegations made by the Trustee, he vigorously contended the May 1998 Payment satisfied the Contract Obligation.

Claimant next contends that, even if Modanlo's actions do not fall within the precise contours of an established remedial doctrine, the Court should not reward Modanlo for his duplicitous behavior. It argues Modanlo fabricated the SARD Contract and signed the false Conformation stating the May 1998 Payment was paid for the SARD Contract. Claimant asks the Court to exercise its equitable authority to prevent Modanlo from receiving a distribution, which will only happen if the objection is sustained. The Court declines to do so because, on the record presented here, Modanlo's actions did not deprive the Claimant from a full opportunity to pursue recovery of the $230,000 from DB Polyot in the Russian courts.

It is apparent on the record that a dispute existed between DB Polyot and Claimant as to which party should be the ultimate beneficiary of the $230,000. Claimant sued DB Polyot in Russia to recover the $230,000, among other amounts. The Russian courts ruled against Claimant. There is nothing in the record from which a factfinder could find that the SARD Contract, the "Conformation," or Modanlo played any role in those proceedings, or that Debtor or Modanlo took any action that caused prejudice to Claimant there.

Viewing the evidence in a light most favorable to Claimant, the Court assumes that Claimant could establish at trial that Modanlo fabricated documents that led the Russian prosecutor to refuse to prosecute DB Polyot and SARD.[8] It is, of course, no small thing to mislead a prosecutor. However, it does not give rise to a claim for equitable relief under these circumstances, where the Claimant had its day in court seeking recovery of the $230,000, and where Modanlo's actions had no bearing on that effort.

Accordingly, the record before the Court establishes that Debtor made the May 1998 Payment to satisfy the Contract Obligation, and Modanlo had nothing to do with Claimant's lack

---

[8] *See* n. 4.

of success in recovering that payment from DB Polyot in the Russian litigation. No reasonable factfinder could find otherwise.

*Conclusion*

For the foregoing reasons Modanlo's objection to the claim will be sustained and the claim will be disallowed.

    cc:    Joseph P. Suntum
Miller, Miller & Canby
200-B Monroe Street
Rockville, MD 20850

James M. Hoffman, Esq.
Offit │ Kurman
4800 Montgomery Lane, Suite 900
Bethesda, Maryland 20814

Edward J. Tolchin
Fettman, Tolchin & Majors, P.C.
10509 Judicial Drive, Suite 300
Fairfax, VA 22030

Cheryl Rose, Chapter 7 Trustee
12154 Darnestown Road, Box 623
Gaithersburg, MD 20878

**End of Memorandum**